The **GENERAL TIRE & RUBBER CO.,**
Plaintiff-Appellee,

v.

The **FIRESTONE TIRE & RUBBER CO.,**
Defendant-Appellant.

The **FIRESTONE TIRE & RUBBER CO.,**
Plaintiff-Appellant,

v.

The **GENERAL TIRE & RUBBER CO.,**
Defendant-Appellee.

Nos. 72–2123 to 72–2126.

United States Court of Appeals,
Sixth Circuit.

Argued June 7, 1973.

Decided Nov. 20, 1973.

Victor DeMarco, Robert W. Poore, Patrick F. McCartan, Robert J. Hoerner, John L. Strauch, Cleveland, Ohio, on brief, for appellant; Jones, Day, Cockley & Reavis, Cleveland, Ohio, John F. Floberg, Gen. Counsel, Stanley M. Clark, Patent Counsel, David A. Thomas, Asst. Patent Counsel, The Firestone Tire & Rubber Co., Akron, Ohio, of counsel.

Charles J. Merriam, Edward M. O'Toole, Clyde V. Erwin, Carl E. Moore, Michael F. Borun, Chicago, Ill., Richard E. Guster, Akron, Ohio, William C. McCoy, Jr., Cleveland, Ohio, on brief for appellee, The General Tire & Rubber Co.; Merriam, Marshall, Shapiro & Klose, Chicago, Ill., Roetzel & Andress, Akron, Ohio, Bosworth, Sessions & McCoy, Cleveland, Ohio, T. E. Pittenger, Frank C. Rote, Akron, Ohio, of counsel.

Before EDWARDS, MILLER and LIVELY, Circuit Judges.

EDWARDS, Circuit Judge.

This patent litigation began in 1961. It involves two proceedings. The first was a suit for declaratory judgment filed by Firestone in Baltimore,

Maryland,[1] against General Tire attacking the validity of a patent issued to General Tire, and in the alternative, claiming a royalty-free license. The second was a suit filed in Cleveland, Ohio,[2] by General Tire claiming infringement of its patent by Firestone (as well as by several other tire companies which have now been dismissed). In 1967 the Baltimore case was ordered transferred to the United States District Court in Cleveland and the issues in two cases were consolidated.

The patent in suit (U.S. Letters Patent No. 2,964,083), an oil-extended synthetic rubber composition for use in tires and tire treads, was found valid by Judge Holtzoff[3] in the United States District Court for the D. C. Circuit after issuance of the patent had been denied following extensive consideration by the Patent Office. The patent was issued December 13, 1960. The application for the patent in suit had been filed by General November 7, 1950, and has been in almost constant litigation here and in many other parts of the world for over twenty-four years.

*The Issues*

The two principal issues in this litigation as we see them are: first, is General Tire Patent No. 2,964,083 valid against Firestone's claims of anticipation, obviousness, and indefiniteness? Second, if so, was and is Firestone licensed to use the patent as a nominee of the Reconstruction Finance Corporation of the United States Government for which General was a contract research agent during the period involved in the research and development of this patent?

We answer both questions in the affirmative.

*Relevant History*

Both issues take us back many years through much poignant American history. The story really begins with Pearl Harbor.

When in December of 1941 the United States suddenly found itself at war, it was equally suddenly cut off from all principal sources of natural rubber. While Germany had already been manufacturing synthetic rubber (by combin-

1. The Baltimore Litigation: Firestone Tire & Rubber Co. v. General Tire & Rubber Co., 130 U.S.P.Q. 138 (D.Md.1961) (motion to dismiss denied and General restrained from prosecuting Cleveland case); General Tire & Rubber Co. v. Watkins, 326 F.2d 926 (4th Cir.) (petition for writ of mandamus to compel transfer to Cleveland denied), cert. denied, 377 U.S. 909, 84 S.Ct. 1166, 12 L. Ed.2d 179 (1964); 331 F.2d 192 (4th Cir.) (motions for writ of mandamus and stay of trial proceedings below denied), cert. denied, 377 U.S. 952, 84 S.Ct. 1629, 12 L.Ed.2d 498 (1964); 363 F.2d 87 (4th Cir.) (motion for writ of mandamus to compel transfer of proceedings below denied), cert. denied, 385 U.S. 899, 87 S.Ct. 204, 17 L.Ed.2d 131 (1966); 373 F.2d 361 (4th Cir.) (in banc) (petition for writ of mandamus to compel transfer granted), cert. denied sub nom., Firestone Tire & Rubber Co. v. General Tire & Rubber Co., 386 U.S. 960, 87 S.Ct. 1031, 18 L.Ed.2d 109 (1967). As a result of the decision in the case cited immediately above, the litigation was transferred to Cleveland, where General had brought suit against Firestone for patent infringement in 1961.

2. The Cleveland Litigation: General Tire & Rubber Co. v. Firestone Tire & Rubber Co., 349 F.Supp. 333 (N.D.Ohio 1972) (motion to dismiss denied); 431 F.2d 1199 (6th Cir. 1970) (motion to dismiss appeal of order on fraud question granted), cert. denied, 401 U.S. 975, 91 S.Ct. 1196, 28 L.Ed.2d 325 (1971). General Tire & Rubber Co. v. Firestone Tire & Rubber Co., 349 F.Supp. 345 (N.D.Ohio 1972), amended in part, 351 F.Supp. 872 (N.D.Ohio 1972). General originally had brought suit against Goodyear, Uniroyal and Goodrich in Cleveland, adding Firestone on April 4, 1961. After the case was transferred from Baltimore, pretrial proceedings were held. All litigable issues in the Baltimore case were consolidated with the Cleveland case, and the Baltimore phase subsequently was dismissed. During the interim period, Goodyear, Uniroyal and Goodrich had settled with General. Firestone remained the only defendant.

3. The Patent No. 2,964,083 Litigation: General Tire & Rubber Co. v. Watson, 184 F. Supp. 344 (D.D.C.1960).

ing the chemicals butadiene and styrene into a compound called "Buna-S"), the rubber industry in the United States until 1942 depended almost entirely upon imported natural rubber. Pearl Harbor made development of a synthetic rubber industry a national military goal of top priority. Congress gave the Reconstruction Finance Corporation authority to take the steps necessary to organize a synthetic rubber industry in the shortest possible time. This was accomplished through an RFC agency, the Rubber Reserve Company, by the building of synthetic rubber plants with government funds, and the signing of contracts between the RFC and the big four of the rubber industry (Goodyear, U. S. Rubber, Goodrich and Firestone), both to manage and operate the synthetic rubber plants and to pool patents and conduct research for the government, the results of which would be shared royalty-free with the government and its "nominees" (i. e. the other rubber companies participating in the research agreements).

General Tire Company was not then a leading producer and was not included in the research agreements, but in 1943 it was tendered and did accept a contract to operate a United States Government synthetic rubber plant in Baytown, Texas.

Synthetic rubber when first produced in quantity in the United States was produced in U. S. Government plants. The government rubber program provided sufficient synthetic rubber for the military needs of the United States in World War II. It eventually provided over 1,000,000 pounds of synthetic rubber per year and even after natural rubber became available at the end of World War II, synthetic rubber continued to dominate the United States rubber industry.

The United States Government's active participation in the production of synthetic rubber continued through the Korean War (1950 to 1953). The synthetic rubber plants were finally sold to private industry in 1955.

*The Synthetic Rubber Tire Process*

About the only facts upon which these bitterly opposed parties have agreed in these years of litigation and thousands of pages of records is a general description of the synthetic rubber tire-making process and the definition of some of the terms employed extensively in this litigation.

*Stipulation as to Process*

In this country the synthetic rubber made from butadiene and styrene was first referred to as Buna-S. Under the Government Rubber Reserve program beginning in 1942 the butadiene-styrene copolymer was called GR-S. For a time after 1942 butadiene-styrene synthetic rubbers were referred to in this country by both designations. GR-S was made at 122°F. by a liquid emulsion polymerization process in which so-called "modifiers" were employed to produce rubbers within the Mooney standards established for the GR-S rubber at an early date in the range of 45 to 55 ML-4. In the early 1940's the American processors wanted a rubber which could be handled in the same equipment they had been using for natural rubber.

Firestone became the operator of a government-owned synthetic rubber plant at Lake Charles, Louisiana in 1943. The general procedure followed in the government-owned plants in producing GR-S during World War II was as follows: Liquid butadiene, under pressure, was mixed with a water emulsion of styrene in the proper proportions and in the presence of the necessary chemicals to start and maintain the polymerization reaction and to "modify" the reaction to produce a product of the specified Mooney.
* * *

The reaction produced a dispersion (latex) of extremely small rubber particles in water. In most government-owned plants, a salt-acid coagulant was then added to produce a coagulum which was sometimes referred to as crumb. However, in the Firestone operated plants at Akron and Lake Charles alumi-

num sulfate (having an acidic pH value) was used as the coagulant. The rubber was separated from the water and passed through warm drying ovens where air temperatures were controlled at approximately 180–190° at most government-owned plants, and at 200–220°F. at the Lake Charles Plant. The rubber was then formed into bales of about 75 pounds.

The German Buna-S rubber and the American GR-S rubber commercially produced prior to 1948 were "hot" rubbers. This means the rubber was made at temperatures of around 122°F. (50°C.).

During World War II, experimental work was done in this country and in Germany upon the production of rubber in which the reaction was carried on at temperatures below 122°F. Rubber polymerized at a temperature of about 41°F. is called "cold rubber". Cold rubber was not commercially produced before 1948, although it had been produced in pilot plant scale in 1947. The temperature of 41°F. required refrigeration, since the polymerization reaction produced heat. When properly compounded in a tire tread, cold rubber proved to have a higher abrasion resistance than GR-S hot rubber. Over the period of about 1948–1952, cold rubber superseded hot rubber for use in tire treads.

In processing natural rubber for tire treads before World War II, the machinery at American tire factories normally consisted of Banbury mixers, mills (rolls) and extruders. The basic techniques now used in the tire factories for handling or processing rubber and from it building pneumatic tires were developed prior to World War II. In a typical procedure for processing natural and synthetic rubber, the rubber and carbon black, then oil and possibly some chemicals, but not those which would cause vulcanization, were worked in the Banbury until thoroughly mixed. Banburys resemble a dough mixer in that they have blades which counter-rotate within a closed housing. The resulting product was called a masterbatch (a masterbatch rubber being rubbery polymer plus one or more but less than all compounding materials). The masterbatch upon removal from the Banbury was set aside to cool. The masterbatch was passed to a second Banbury, where the remaining ingredients were added and mixed in to form the final stock; these ingredients included the sulfur and vulcanizing chemicals, and in some instances additional softening oil to facilitate processing. The temperatures in the second Banbury were considerably lower than in the first Banbury in order to avoid premature vulcanization which could occur after the sulfur was added. The stock was cooled after removal from the second Banbury. The cooled final stock from the second Banbury was warmed up by working on warm-up rolls before extrusion.

From the warm-up rolls, the final stock, when sufficiently warm, was moved to the extruder. The extruder was a screw-fed device provided at its exit end with a die of the proper shape for the extrusion.

### Stipulated Definitions

The plasticity of unvulcanized rubber and rubber compounds, both natural and synthetic, can be measured by a device known as a Mooney plastometer. The measurement involves rotating a steel disk (the rotor) embedded in a specially prepared rubber specimen which is confined in a cavity surrounding the rotor. The specimen is heated and maintained at a specific temperature, usually 212° F. as the rotor turns at a prescribed speed (2 r.p.m. is standard) for a specified time. The specimen's resistance to the rotation of the rotor is measured and shown on a dial as "Mooney" units. The dial is usually read at four minutes after a warm-up period of one minute. There are two sizes of rotors varying in diameter. One is referred to as large rotor and the other as small. The readings are normally expressed as ML-4 meaning Mooney, large rotor at four minutes after warm-up or MS-4 mean-

ing Mooney, small rotor at four minutes after warm-up. If no temperature is stated for a reading, 212°F. is meant unless the context indicates otherwise. The Mooney plastometer came into use in respect to synthetic rubber in this country about 1942–1943. It is named after its designer, Mr. Melvin Mooney.

\* \* \* \* \* \*

Natural rubber may have a Mooney as high as 110–120 ML-4. Natural rubber when worked by itself on a mill or in a Banbury breaks down readily to a lower Mooney.

Neither natural rubber nor any synthetic rubber is useful in a tire unless it is mixed with other materials to form a vulcanizable compound. These materials include carbon black and various chemicals added in small proportions for the purpose of obtaining proper vulcanization and for preventing oxidation. Sulfur is the most common vulcanizing agent, and other chemicals are used to accelerate the vulcanizing reaction. Tire tread recipes include some softeners.

Carbon blacks employed in tires and particularly tire treads are known as reinforcing blacks. The degree of reinforcement depends upon the particle surface area and the structure of the carbon black. Before 1940 the best available carbon blacks were the channel blacks, which in essence were lampblacks made by burning natural gas with less than sufficient air for complete oxidation, in close proximity to a cold metal channel (I-beam) upon which the black was deposited. One useful type of channel black was referred to as EPC (easy processing channel). During World War II, furnace blacks appeared which were made by cracking natural gas in a furnace. The furnace blacks had about the same particle size as the channel blacks but had a different particle structure, were alkaline instead of acid and were not as easy to incorporate in rubber as the EPC blacks, but gave considerably higher abrasion resistance to the ultimate rubber product. \* \* \* The amount of carbon black required to give

the desired reinforcement and working properties of the rubber compounds varies with the type of carbon black employed and the desired physical properties of the vulcanizate. \* \* \* With natural rubber, about 50 parts carbon black were employed for 100 parts rubber in tread stocks, and a similar ratio was used with synthetic rubber.

Tensile strength of rubber is measured by the force required to produce rupture by longitudinally stretching a specimen, stated in pounds per square inch in this country and kilograms per square centimeter abroad, based on the cross-sectional area of the unstretched specimen.

\* \* \* \* \* \*

"Heat build-up" (sometimes called "hysteresis" in this industry) is an important quality of a rubber intended for use in a tire. The lower the heat build-up, the better the rubber for tire treads, other things being equal. When rubber is deformed, it generates heat. Various methods of measuring heat build-up are employed, all of them involving repeated deformation of the rubber.

### Important Definitions

Of great importance in this appeal are three terms: polymer, masterbatch and compound.

*Polymer* is defined by Webster as "a natural or synthetic chemical compound or mixture of compounds formed by polymerization and consisting essentially of repeating structural units." Webster's Third New International Dictionary of the English Language Unabridged 1759 (Merriam-Webster ed. 1961). Polymerization is a chemical reaction in which small molecules (here molecules of butadiene and styrene) combine to form long chain molecules.

*Masterbatch*—Webster defines this word as "a mixture that consists of rubber . . . with one or more compounding ingredients in definite proportions but higher concentrations than in a normal mix and that is used for convenience in compounding." *Id.* at 1390.

In the preceding stipulation the parties agreed that a masterbatch was "rubbery polymer, plus one or more, but less than all compounding materials." The stipulation also described what materials did and what did not go into the masterbatch:

> In a typical procedure for processing natural and synthetic rubber, the rubber and carbon black, then oil and possibly some chemicals, but not those which would cause vulcanization, were worked in the Banbury until thoroughly mixed. Banburys resemble a dough mixer in that they have blades which counter-rotate within a closed housing. The resulting product was called a masterbatch.

*Compound* is defined by Webster: "1. A chemically distinct substance formed by union of two or more ingredients (as elements) in definite proportion by weight and with definite structural arrangement." *Id.* at 466. As used in this case "compound" appears clearly to be the final stock (after addition of vulcanizing ingredients) as it is mixed and rolled before being extruded as a tire tread.

### *Validity of the Patent in Suit*

The initial court decision in this lengthy litigation overruled the Patent Office and held that General was entitled to issuance of this patent. Judge Holtzoff thus described the invention:

> The invention lies in the field of synthetic rubber. The specific invention claimed is an article of manufacture. It is tough rubber to which a large amount of oil is added in the course of manufacture, with the result that the same amount of raw material produces a much larger amount of the finished product than theretofore, and also that the rubber so produced has superior qualities, especially for use as tire treads. It is known in the trade as "oil extended rubber". In their application for the patent, the inventors state:
>
> > "We have found that the tough rubbers which were considered unprocessible and not suitable for making extruded tire treads in production may be mixed with relatively large amounts of one or more compatible oils or plasticizers to provide compounds of exceptional quality."

General Tire & Rubber Co. v. Watson, 184 F.Supp. 344, 346 (D.D.C.1960).

The patent itself is attached to this opinion as Appendix A. But some idea of its purpose may be derived from the first portion of the patent:

2,964,083

### PNEUMATIC TIRES AND TREAD STOCK COMPOSITION

Emert S. Pfau, Gilbert H. Swart and Kermit V. Weinstock, Akron, Ohio, assignors, by mesne assignments, to The General Tire & Rubber Company, Akron, Ohio, a corporation of Ohio

Filed Nov. 20, 1950, Ser. No. 196,584

22 Claims. (Cl. 152–330)

The present invention relates to the manufacture of pneumatic tires of the type suitable for use on various types of motor vehicles, airplanes and the like. It particularly relates to pneumatic types having extruded tread portions of an exceedingly tough synthetic rubber.

It is an object of the present invention to provide an extruded tread for pneumatic tires which tread has improved properties combined with lower cost than those heretofore produced.

It is another object of the present invention to provide a mass of a rubber compound which does not stiffen in the coldest climates or which has clearly improved flexibility at low temperature combined with good abrasion and has other desirable physical properties.

It is a further object of the present invention to provide pneumatic tires

having properties superior to those presently prepared which can be produced in volume utilizing the usual rubber machinery and which use less rubbery polymer.

Other objects will be apparent from the following description of the invention.

Only a few types or a few varieties of the many various types of synthetic rubber have been considered suitable for the manufacture of tires and in particular the treads of tires. This is because the rubber characteristics or qualities for tire treads are exacting and difficult to meet. Tire treads must be of uniform weight and cross-section; they must wear well and resist cracking both due to flexing and light; they must have substantial tensile strength and toughness. These qualities are had only in rubber compounds of the highest quality. Only highest quality rubber compounds are therefore used for good tires whereas in mechanical goods and especially in rubber footwear cost per unit of compound weight and not quality is the controlling factor.

Even though quality is of prime importance in tires, it is essential that tires be capable of being made in volume and to make tires in volume it is necessary that the rubber compounds used be capable of extrusion through an orifice (including calendering which is, in fact, extrusion through a die having rotating sides). It is only by such extrusion processes that tire treads have been made in volume and with uniformity.

Naturally, the rubber must be rendered sufficiently plastic for extrusion by apparatus of a rubber factory. Synthetic rubbers may be produced in a relatively tough state or in a relatively more plastic state as desired by simply regulating the percent of modifier. For example, a long chain mercaptan may be present in the mixture and the polymerization stopped at a point where the desired rubber is obtained. Larger amounts of mercaptan and lower degrees of conversion give more plastic synthetic rubbers with less cross-linking or gell formation.

Tough rubbers have always been broken down by long mastication or heat softening to a plastic or extrudable state before they are used in preparing tires for sale. This even though it has long been known that by an expensive and inefficient press molding operation (as distinguished from extrusion where material is forced through an orifice) a tread or at least a portion of a tread may be made without such breakdown or molecular degradation necessary for extrusion and that treads of such non-broken down rubber have a much higher abrasion resistance than those of the broken down rubbers.

The earliest synthetic rubbers were made before the discovery of the effects of mercaptan and other modifiers and were therefore so tough that they could not be processed in the ordinary factory mill without extensive plasticization. Plasticization may be and was generally accomplished by extensive mastication and/or heat softening to cause degradation or break-up of the molecules of the rubber. After this molecular degradation was had, plasticizers usually in amounts of 15 percent or less were added to the rubber to further reduce plasticity.

Inasmuch as the use of plasticizers or softeners in rubber compounds has been shown to be undesirable and to result in marked deterioration in physical properties, the use of appreciable amounts of liquid plasticizers in rubber compounds of the quality required for pneumatic tires was not even considered or if considered, was never found to be useful. This reasoning was applied even to certain mechanical goods where quality was important. In tire treads the maximum amount of softener tolerable has been about 15 percent based on the weight of the rubber and only 5 to 10 percent is usually used. Very recent work has

been directed to the softening of these tougher synthetic rubbers so that they can be used in a factory. The process used is to force air into the Banbury to accelerate deterioration of the polymer. We are unaware of any advantage in the process as the polymer is so deteriorated. Work has also been done to deteriorate or breakdown latex of tough rubbers in a vain attempt to utilize the advantage inherent therein.

With the discovery of the effect of modifiers and aliphatic mercaptans which permitted the production of more plastic rubbers of the general purpose type, synthetic rubbers suitable for tires were produced directly in the plastic stage where they could be processed in the factory with little, if any, premastication. The general trend is now toward even more plastic rubbers. This trend and this procedure was adopted even though as above indicated it has long been recognized that the tough rubbers when carefully processed and broken-down to a very limited extent provided superior tire treads than the softer rubber. It was reasoned and generally believed that inasmuch as the rubber necessarily had to be plasticized or broken-down for factory processing that one might, just as well start with a highly modified or soft rubber in the first instance and obtain the same end product.

We have found that the tough rubbers which were considered unprocessable and not suitable for making extruded tire treads in production may be mixed with relatively large amounts of one or more compatible oils or plasticizers to provide compounds of exceptional quality. Such compounds containing large amounts of softener have produced tire treads superior to those produced with the general purpose GR–S rubbers heretofore available and at very much reduced cost. The softener is incorporated, in accordance with the present invention, in the rubber before the rubber is deteriorated by mastication and preferably while the rubber is in a finely divided state such as is present in aqueous dispersions or in a crumblike state with small particles which may be separated by a pigment such as carbon black. Mastication in the presence of large amounts of softener added in the stages of the mastication procedure prevents the breakdown of the rubber such as is had by the usual masticating procedures.

The process employed is described thus in the patent specification:

In order to obtain maximum advantage from the tough high Mooney rubbers these rubbers should be combined with oil when in the finely divided state so that the oil can enter (be absorbed) between molecules of the rubber to facilitate slippage one on the other before they are ripped apart and broken-up by mastication. If the high Mooney rubbers are obtained in the form of a bale or large mass, they should for best results be pulverized or granulated to a powdery or crumblike state prior to contact with the oil. Such is accomplished without deteriorating the rubber. In contrast to low Mooney rubbers such as standard GR–S (Government Synthetic rubber, a general purpose butadiene-styrene copolymer), the high Mooney rubbers, when masticated in a Banbury mixer, will usually form a pulverant mass because of the lack of plasticity when they are incorporated into a Banbury mixer or the like. Frequently, however, this is not the case. In such cases pulverization of the entire material may be accomplished by adding small amounts of carbon black or other pigment with the rubber before plasticization has occurred so that the rubber particles are insulated from each other and prevented from being packed together as they are formed by the mixing apparatus. When the required amount of oil or other suitable plasticizer is added at the time the material is in a finely subdivided condition it is uniformly absorbed and best results are obtained. Addition of

large proportions of oil used in the practice of the present invention to a large solid mass of rubbery polymer makes it more difficult to produce a homogeneous compound. When the rubbers are in the finely divided state, they are rapidly swelled by the oil without deterioration and the rubber particles thereafter readily agglomerate to form a plastic mass.

By utilizing our preferred procedure factory processable rubber compounds may be made in the very short time commensurate with ordinary procedures based upon the relatively highly modified and easily processable commercial synthetic rubbers. The rubber articles such as tire treads produced from the compounds having large amounts of oil are equal to and in many cases considerably superior in properties to those produced from conventional mixes.

When the rubber is available in the form of a latex, the oil is preferably first emulsified and incorporated in the latex in the emulsified form and the mixture suitably coagulated. Preferably a so-called shock method of coagulation is used wherein the coagulable latex-oil emulsion mixture is passed into a large mass of coagulating medium such as salt and acid. Even unemulsified oil may also be incorporated into the wet coagulum or crumb even in the presence of free drainable water and it is found it will be selectively absorbed even in the presence of such water.

In the compounding of the synthetic rubber-oil mixtures the total quantity of oil plus synthetic rubber is considered to be rubber. By this method compounds formed in accordance with the present invention generally have hardness and physical characteristics similar to normal compounds made from commercial easy processing synthetic rubbers. To illustrate this, a good tread compound having 100 parts of rubber and 50 parts of carbon black generally gives properties which are desirable. Using tough rubber-oil combinations with 100 parts of rubber and 100 parts of oil, we would utilize 100 parts of the carbon black for about equal hardness and comparable properties.

Typical of the 22 claims of the patent are the following:

A curable rubber tread stock the principal ingredients of which are an aliphatic hydrocarbon compatible synthetic hydrocarbon polymer of a conjugated diolefinic compound of less than 8 carbon atoms, 20 to 100 parts of a compatible plasticizer to 100 parts by weight of said polymer and a high abrasion furnace black in an amount of at least 35% by weight of the combined polymer and plasticizer, said polymer having a Mooney viscosity of at least 100 prior to compounding with said plasticizer and the proportion of plasticizer and carbon black in the composition being that required to produce a tread stock having a Mooney viscosity of from 30 to 70.

A curable rubber tire tread stock comprising essentially a hydrocarbon-oil-compatible, rubbery, synthetic hydrocarbon polymerization product of a conjugated diolefinic compound having not in excess of 8 carbon atoms, which compound has a raw Mooney plasticity of at least 90 (ML–4), a reinforcing carbon black pigment, and at least 30 parts by weight of a compatible plasticizer per 100 parts of said polymerization product, said rubber tread stock containing from 30 to 80 parts by weight of said reinforcing pigment per 100 parts by weight of the combined amount of said polymerization product and said plasticizer present, and said tread stock having a Mooney plasticity (ML–4) not appreciably in excess of 80 and not substantially less than 40.

A curable rubber tire tread stock comprising essentially a hydrocarbon-oil-compatible, rubbery, synthetic hydrocarbon polymerization product of a conjugated diolefinic compound having not in excess of 8 carbon atoms, which has a raw Mooney plasticity of at least 90 (ML–4), a reinforcing carbon

black pigment, and a compatible oily plasticizer, there being from 30 to 100 parts by weight of said oily plasticizer to 100 parts by weight of said polymer and from 30% to 80%, by weight of said carbon black, based on the combined weight of said polymer and said plasticizer present, and said tread stock having a Mooney plasticity (ML–4) not appreciably in excess of 80 and not substantially less than 40.

The District Judge who tried this case made the following finding concerning the problem the inventors were seeking to solve:

[T]he conventional commercial manufacture of the tread portions of pneumatic tires at the time of the invention of the patent in suit was as follows: Butadiene-styrene rubber with a plasticity of about 50 Mooney was mixed with about 50 parts of carbon black and about 8–12 parts of hydrocarbon oil (both based on 100 parts of rubber) and mixed in a Banbury for a total of about seven minutes, then extruded to form the tread portion of the tire. The equipment, procedures, and times employed were basically the same as those that had been used for processing natural rubber prior to World War II. The use of high Mooney rubber (90 Mooney and above) was avoided because it was too tough to process commercially into a tire tread or tread compound, even though it had been known from the early 1940's that its abrasion-resistant properties were superior. The use of amounts of oil beyond 8–12 parts was also avoided, even though it had been known for years that oil was a softener for rubber, because it was thought that more oil was incompatible with the maintenance of the high physical properties demanded of a tread rubber. It was in the context of this art that the inventors began their work.

The features of this invention emphasized by General are these:

1. The employment of a polymer of over 90 Mooney in place of the customary 50 Mooney polymer.

2. The economical increase of the amount of synthetic rubber for tire tread stock by extension of the polymer by addition of 20 parts or more of oil where previously it was thought that such amounts of oil would degrade the quality of the tire.

3. The addition of the oil when the polymer was in a finely divided state (crumb) so that the oil mixed quickly with the polymer without long mastication which tended to degrade the polymer.

4. The employment in making an oil extended synthetic rubber of the normally used factory machinery without any extension of production time.

5. The development of a synthetic rubber of at least comparable characteristics as to resistance to friction and heat buildup and superior characteristics as to use in frigid climates.

This record makes clear that the novelty claimed lies in the use of high Mooney polymer, in the proportions of oil and carbon black added, and in the method of processing the components rather than in the addition of any new ingredient to the compound.

The patent in this case, as noted above, was granted by Judge Holtzoff's decision thirteen years ago after the same issues (anticipation, obviousness, and indefiniteness) now sought to be raised before us were vigorously litigated. General Tire & Rubber Co. v. Watson, 184 F.Supp. 344 (D.D.C.1960). These same issues were subsequently presented to the British courts.[4] The Supreme Court of Judicature—The Court of Appeals—made a thorough, indeed a brilliant, analysis of each of these three issues (albeit on a somewhat dif-

4. General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., Ltd., [1971] R.P.C. 173

(Ch. 1970), aff'd, [1972] R.P.C. 457 (C.A. 1971).

ferent record and legal standards) and affirmed the validity of the patent as determined by the British trial court.[5] We now have before us a judgment of the United States District Court for the Northern District of Ohio, Eastern Division, again affirming the validity of this patent against Firestone's objections. This judgment has been arrived at after nearly five years of trial proceedings in two different District Courts. We do not rely too heavily upon either the District Judge's opinion or his extensive findings of fact, since they bear the unmistakable stamp of the work product of General Tire's attorneys. But we certainly cannot ignore the fact that the trial judge who heard and reviewed these reams of testimony resolved the basic issues pertaining to this patent in favor of its validity.

■ We thus turn an eye, somewhat influenced by the history of this litigation, to examine once again what so many other judges have considered. Stated in other words, this patent comes to us for review with a high presumption of validity. 35 U.S.C. § 282 (1970); Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828, 837 (6th Cir.), cert. denied, 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86 (1956); Midland Steel Products Co. v. Clark Equipment Co., 174 F.2d 541 (6th Cir.), cert. denied, 338 U.S. 892, 70 S.Ct. 243, 94 L. Ed. 548 (1949); Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435 (W.D.Mich.), aff'd, 430 F.2d 221 (6th Cir.), cert. denied, 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1969); United States Plywood Corp. v. General Plywood Corp., 230 F.Supp. 831, 837 (W.D. Ky.1964), aff'd, 370 F.2d 500 (6th Cir. 1966), cert. denied, 389 U.S. 820, 88 S. Ct. 39, 19 L.Ed.2d 71 (1967).

Firestone's appeal attacks the District Judge's upholding of the validity of this patent. Firestone claims 1) that the patent was anticipated by the prior art, 2) that the alleged invention was clearly obvious under Section 103 (35 U.S.C. § 103), and 3) that the claims of the patent are vague and unduly broad, i. e. indefinite.

### Anticipation

■ We understand thoroughly that General's invention was by no means the first attempt to use oil in making synthetic rubber. The use of oil in small quantities as a plasticizer was standard practice in the synthetic rubber industry. In addition, from time to time there had been efforts to experiment with addition of larger quantities of oil. The British Court of Appeals pointed out accurately, we believe, that the Semperit (a) (Application S153,625) and Semperit (c) (Application No. 157,456) patents (Austrian) relied upon by Firestone did not teach the minimizing of mastication of the polymer and that the Wilmington patent did not teach the use of a high Mooney polymer.[6] Since these features are the essence of General's patent, we agree that these publications do not represent anticipation.

The United States Government's Tire Test Reports 111 and 123 represent a serious challenge to this patent. Yet in the end in our review of these two tests, we cannot hold that the District Judge's conclusion that they were "abandoned and taught away from, not toward the invention" was "clearly erroneous." Test Report 123 was the later of the two tests and was in part occasioned by Test Report 111's showing of success with a 97 Mooney tire. The conclusion of Test Report 123, however, was to recommend a polymer of 50 Mooney cold rubber, and commercial production thereafter was based upon 50 Mooney rubber. It is

---

5. The patent in suit has been held to be valid in England. See note 4, supra. In South Africa a related patent, though viewed as novel, was held as invalid because of the indefiniteness of a term not present in the patent before us. Related patents were held to be invalid in France and Mexico.

6. These publications had also been urged upon Judge Holtzoff without success.

true that these tests of polymers with different Mooney ratings and different oil loadings might have revealed the possibilities of success with the employment of a high Mooney polymer and substantial oil extension. Perhaps because of additional processing or perhaps because of the industry's established aversion to oil because of degradation of the rubber, no such result was realized or recommended.

■ The District Judge's findings which follow are not contradicted by this record and are not clearly erroneous:

165. The conclusion drawn from Tire Test 123, as stated in the final report prepared by Rubber Reserve test fleet and approved by Mr. Greer, the head of research and development for the government and one who had followed the test closely, was that:

"The outstanding experimental polymer from the standpoint of treadwear was the Cumene-hydroperoxide 50 Mooney rated 21% superior to control GR–S–10 in this respect."

166. The Court finds that the experimental work allegedly involving higher-than-normal viscosity rubbers in Tire Test 123 was abandoned and taught away from, not toward, the invention:

(a) In accordance with the conclusion of the final report on Tire Test 123, 50 Mooney cold rubber went into large scale commercial production thereafter and eventually became the standard rubber for tire treads. In contrast, cold rubber having a Mooney above 65 Mooney was not commercially produced or used for tire treads until after General's invention.

(b) The results of the test itself discouraged further work with high Mooney rubber. It emphasized the 50 Mooney rubber as the outstanding polymer, and it showed that the high Mooney rubbers could not be processed in the ordinary time or manner.

(c) Unfavorable comments on the high Mooney-high oil aspect of the tests were reported by personnel at Phillips.

(d) Unfavorable comments on the high Mooney-high oil compounds were also expressed by Lake Shore personnel. In March, 1951 after General's invention had been announced, an inquiry about the Tire Test 123 work was made of Mr. Roy E. Rude, technical manager at Lake Shore when the tests were made and a major participant in them. He wrote that he was a "low Mooney advocate" and that as a result of Tire Test 123 work, Lake Shore would "not recommend the use or incorporation of over 12 parts of softener." Further, regarding Tire Test 123, he said:

"We discontinued our experimentation on high Mooney GR–S with high oil to work on cold rubber. The better polymers on cold rubber have shown to be ones with low Mooney but no advantage was seen in the very high Mooney polymers, in particular with the high oil."

(e) Mr. Greer, in trying to determine what General's invention was, considered the high Mooney-high oil work reported in Tire Test 123, but he concluded General's most likely course was with low Mooney rubber and high amounts of carbon black.

*Obviousness*

Judge Holtzoff's pertinent and accurate description of how General happened upon this invention is perhaps as good a way as any to open discussion of this topic:

We now reach the history of the appellants' invention. The three individual inventors were research chemists or chemical engineers employed in the laboratory of the corporate plaintiff, the General Tire and Rubber Company. Late in 1949, when the industry was searching for additional means to increase the supply of rubber, the three inventors conceived the project of using tough rubber, which had been regarded as useless, for inferior pur-

poses such as rubber mats for automobiles. In order to make this rubber usable for these purposes, they began to mix it with large quantities of oil. They discovered accidentally that instead of merely making it possible to employ for inferior purposes rubber of a type that had been regarded as not usable at all, they were producing a high quality of rubber suitable for tire treads. They found that mixing oil in large quantities of over 20 parts of oil to 100 parts of rubber with very tough rubber, or high Mooney rubber as it was known in the trade, increased the amount of the final product. They not only made it usable but they improved its quality and found that it was excellent for tire treads.

Thus we have a development that was discovered accidentally by research scientists who were working with an entirely different objective in mind than the one which they finally achieved. This was not an invention, in other words, laboriously derived through trial and error or attained by a long process of experimentation. It was one of those unusual situations where a discovery is made or an invention designed accidentally while the inventor or discoverer was in the throes of a somewhat different development.

▆ The present statute emphasizes the proposition that it makes no difference as to patentability by what manner an invention is made. 35 U. S.C. § 103. The fact, however, that the discovery was made accidentally by a person skilled in the art, while others had been working to find other ways and means to achieve the same general objective, namely, to increase the supply of usable rubber, would seem, to some extent at least, to negative the contention that the invention was obvious. This circumstance, of course, is not conclusive, but it is one of the many matters that are worthy of consideration in that connection. General Tire & Rubber Co. v. Watson, 184 F.Supp. 344, 347 (D.D.C.1960).

In the British Court of Appeals decision upholding the British patent, the opinion of Lord Justice Sachs pointed significantly to a recognized "gap" in the industry's knowledge concerning tire making:

The plaintiffs in their specification propounded the existence in 1950 of a gap in industrial knowledge which was in the first instance judgment, [1970] F.S.R. at 284,* stated in the

* [1971] R.P.C. at 222.

following terms:

"It was realised that if one could process tough rubbers in such a way as to retain their long molecules and therefore their high abrasion resistance after manufacture, a very good tyre could be produced, but the difficulty apparently was that no one realised how to do it".

The existence in 1950 of that gap was challenged in this court. However, in a well-known publication of Firestone (U.S.A.), the parent company of the first defendants, called "Synthetic Rubber Facts" (Vol. N, page 7), it has, since the date of the patent, been stated:

"It had been known for some time that high Mooney polymer had superior treadwear resistance, but this property could not be exploited because of the difficulty of processing the polymer".

Moreover, in an internal memorandum (dated 17th January 1951—G.5, 5,071), the Manager of the Research Division of Goodyear, a rival company to the plaintiffs in the U.S.A., also refers to this gap. (That memorandum deals with the researches set in train by the 21st November 1950 (G.10, 10,026) memorandum from the U.S. Office of Rubber Reserve after the plaintiffs had, on 7th November 1950, written (G.5, 5,067) to the latter saying they had made an important discovery—the "22 per cent. more rubber" letter to which further reference will be made.) The Goodyear "Story

of the Tire" (G.11, p. 11,248B) contains this passage:

"The rubber chemist had long believed that tough rubbers possess higher quality than the softer rubber ordinarily used, but there was no feasible way to employ them, because of processing difficulties with conventional rubber factory production equipment".

On that footing the 1950 problem was as to how to process tough polymers in the requisite way so as to provide results which were commercially useful and at the same time economically viable, for which purpose the polymers would have to have the least practicable degree of degradation.

From the evidence taken as a whole —including the two extracts cited—it is manifest that, industrially speaking, a gap as defined by the trial judge existed in 1950 and that it produced the above related problem. It is no less clear that the process set out in the patent-in-suit provided the answer to the problem. Further it is plain, as, indeed, is conceded by the appellants, that immediately after June 1951, (when the plaintiffs publicised it in an issue of "India Rubber World"—G.6, 6,060) that process commenced to be adopted by the tyre manufacturing industry and that in due course it achieved the great commercial success already mentioned. General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., Ltd., [1972] R.P.C. 457, 477–478 (C.A.1971).

While these observations come from a different legal jurisdiction and from a different record, we believe their logic to be fully applicable to our case and we adopt it.

■ One of the ways by which a showing of obviousness may be rebutted is to point to a long-felt and (up to the point of invention) unfulfilled need. Graham v. John Deere Co., 383 U.S. 1, 17–18, 35, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Inland Mfg. Co. v. American

Wood Rim Co., 14 F.2d 657, 659 (6th Cir. 1926); American Ball Bearing Co. v. Finch, 239 F. 885, 889 (6th Cir. 1917).

The need was felt in 1950 and General's invention filled it.

■ Still another (albeit not necessarily controlling) factor tending to rebut obviousness is immediate acceptance of the invention in the art. United States v. Adams, 383 U.S. 39, 52, 86 S. Ct. 708, 15 L.Ed.2d 572 (1966); Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 106 F.2d 554, 558 (6th Cir. 1939).

That such acceptance followed General's invention is beyond dispute. Oil extended masterbatches became the standard production item in the Government's synthetic rubber plants. Every major tire company used such masterbatches in compounding their tire treads.

The initial reaction of the industry to General's first announcement that it had a method of producing 22% more rubber was skepticism and scorn. The Government reacted to General's offer to sell its invention for $60,000,000 by efforts to determine what the invention was. In spite of its possession of all of the prior art, including Tire Tests 111 and 123, it completely failed to do so.

The answer probably can be found in the testimony of one of Firestone's witnesses in the High Court of Justice, Chancery Division:

Q. "Did you find anything technologically surprising in the development, as opposed to economically"?

A. "Yes; I must honestly say that we were surprised that one could use such quantities of oil."

Q. "Such big quantities"?

A. "Yes . . . We had got so accustomed to the oil loadings we had used for many years, that one regarded the levels we were using of 5 or 8 parts as being normal. 45 parts of oil of course seemed, you know, an astonishing amount to use, even if it was a high Mooney rubber."

We conclude that General's patent is valid as against the claim of obviousness.

### Vagueness and Undue Breadth

This court's last adventure with a patent case of this magnitude turned on a finding that an immensely valuable patent upon the oxygenation process for making steel was invalid for undue breadth. *See* Kaiser Industries Corp. v. McLouth Steel Corp., 400 F.2d 36 (6th Cir. 1968). There this court concluded that the claims of the patent were so broadly drawn as to levy tribute upon practically any method of employing oxygen to make steel.

We have reviewed the claims of this patent with the *Kaiser* case clearly in mind and find utterly different conclusions. The claims are made applicable to polymers of specific Mooney ratings (not less than 90 and in a nonbroken-down state) combined with hydrocarbon oil and high abrasion carbon black additions in specifically named parts. The claims are, in our view, reasonably clear to possible infringers and so limited as properly to claim the invention without claiming any and all oil additions to rubber polymers. Hence, we affirm the District Judge's rejection of Firestone's claims of vagueness and undue breadth.[7]

We find no merit to Firestone's appeal concerning infringement.

We affirm the judgment of the District Court holding General Tire's Patent No. 2,964,083 to be valid and infringed.

### The Research Contract, The General Tire Patent No. 2,964,083 and Their Relationship

The decision just announced above may, however, prove to be of relatively little value to General. For as we indicated at the outset, we also hold that General is obligated by the explicit terms of its Research Contract with the Reconstruction Finance Corporation to give a royalty-free license to practice this invention to the RFC and its nominees, of which Firestone is clearly one.

In 1949 RFC and General entered negotiations upon a research contract. The contract was signed on January 17, 1950, but it was dated January 1, 1949, and contained provisions for reimbursement of General for research performed during the whole year of 1949. General billed and was paid by RFC for research during the last half of 1949. The scope of the research work was "rubber-like polymers" excluding a particular General Tire Patent No. 2,441,090, but including "carbon black masterbatches."

In June of 1949 General first began experimenting with adding substantial amounts of oil to high Mooney rubber. General never disclosed any information concerning its work on oil extended rubber to the Government. As will be shown below, General's experiments progressed until November 7, 1950, when General first announced its invention of an oil extended rubber, following which it filed its patent application on November 20, 1950.

The interrelationship in time sequence between key events pertaining to the re-

---

7. Although the issue is not squarely raised by Firestone's appeal, we have sua sponte given much thought to whether the first 12 of the claims of the patent in suit are void for undue breadth in a totally different sense. These claims all begin:

"What we claim is:

"A pneumatic tire having a tread portion comprising a volcanized synthetic rubber compound containing, etc."

The invention involved herein is, of course, not a tire at all. It is as the later claims describe it "a curable rubber tire tread stock." The invention does not describe a single feature of a tire except General's

newly formulated synthetic rubber tread stock. There is no dispute but that this stock is extruded through dies and processes old in the art and attached to the tire carcass, stitched and vulcanized in processes and machinery also old in the art.

In the end we have concluded that the language of these claims immediately following the words "a pneumatic tire" is so restrictive as to require them to be read to claim "a tread portion [of a pneumatic tire] comprising a vulcanized synthetic rubber compound containing, etc." Under this reading we find no occasion to enter a holding of invalidity.

search contract and to the patent is set forth below:

| | |
|---|---|
| January 1, 1949: | Effective date of the Research Contract. |
| June 1949: | General researchers for the first time add oil and carbon black to high Mooney rubber. |
| August 15, 1949: | General establishes a special project, "Special Low Cost Wet Masterbatch for Tractor Treads and Second Line Passenger Treads." |
| September–October 1949: | Evaluation of various masterbatches of oil, carbon black, and rubber. |
| January 17, 1950: | Research Contract signed. |
| January 24, 1950: | Due to the success of the evaluation tests, General upgrades the project to test the treads for premium line tires. |
| January 1950: | Entire output at the Baytown plant, now operated by General, is in carbon black masterbatches. |
| March 22–May 8, 1950: | Tire tests conducted by General on the experimental tires geared for premium, not secondary, line tires. |
| November 7, 1950: | General's public announcement of the invention and statement that tests showed that treads made according to the invention were better than conventional tires. |
| November 20, 1950: | Patent application filed by General. |
| January–February 1951: | Government work undertaken which attempted to discover General's invention. |
| June, July, August 1951: | India Rubber World articles concerning invention. |
| Fall 1951: | General begins making and conducting developmental work on oil masterbatches at Baytown, at the Government's request. |

The Research Contract is printed in full with this opinion as Appendix B, but the portions of it which we deem critical to decision follow:

WHEREAS, the Operating Agreement provides for the reimbursement by RFC to Contractor of the cost of conducting research, experimental, laboratory, developmental, and pilot plant work to the extent approved in advance by RFC in accordance with arrangements to be mutually satisfactory to RFC and Contractor (all such work being hereinafter referred to as "Research Work") ; and

WHEREAS, it is deemed desirable that an arrangement be made between RFC and Contractor relative to patent and other rights which may result from the conduct of the Research Work authorized hereunder;

\*   \*   \*   \*   \*   \*

3. The applied and developmental Research Work to be conducted hereunder shall be directed to the determination of generally accepted principles for, and to the adaptation of such principles to techniques for, the production of rubber-like polymers of butadiene, and of rubber-like copolymers, mixed polymers and interpolymers of butadiene with styrene; the content of butadiene being within the range of 50% to 100% by weight of the rubber hydrocarbon present. The scope as above indicated excludes any work under or related to Contractor's "wet smear" invention, covered by Patent No. 2,441,090, but includes carbon black masterbatches and may be further extended by mutual agreement in specific instances.

4. Contractor shall prepare and submit to RFC monthly progress reports and final reports covering in detail all work done hereunder. Said monthly reports shall be submitted not later than the fifteenth day of each following month, and in addition said final reports shall be prepared and submitted promptly upon completion of each distinct subdivision of the work. In addition to said reports, Contractor shall send a representative, well informed in the research provided for, to such meetings as RFC may call.

5. Contractor shall also promptly report and make fully available to RFC or its nominees all information within the scope, as defined in paragraph 3 above, of the research conducted for RFC hereunder (whether patented, patentable, or unpatentable, and irrespective of

whether resulting from work reimbursed by RFC) developed or acquired from any source during the term of this contract by Contractor or its Subsidiaries and Affiliates (Companies in which Contractor now has or may in the future acquire, directly or indirectly, fifty per cent (50%) or more of the stock having the right to vote for directors).

6. In addition to the information submitted under paragraphs 4 and 5 above, Contractor shall disclose and make available to RFC or its nominees, to the extent and whenever requested, all information in the possession of Contractor or its Subsidiaries and Affiliates during the term of this contract, which is outside the scope of the research conducted for RFC hereunder, but which is necessary in connection with the utilization of the information so submitted in the production or use of rubber-like polymers, copolymers, mixed polymers and interpolymers of the composition defined in paragraph 3 above; whether or not any of such information results from work, the cost of which is reimbursed by RFC, or whether it is patented, patentable or unpatentable; but such additional information specifically shall exclude that pertaining to subsequent compounding of synthetic rubber, its latices and master-batches, or pertaining to the preparation of butadiene, styrene, isoprene, vinyl monomers, and of other raw materials, or pertaining to the preparation of accelerators, antioxidants, catalysts, extenders, plasticizers, carbon or lamp black, and of any other agents for use in the aforesaid production or use.

7. Contractor hereby grants to RFC and its nominees (1) a royalty-free license to utilize without limitation any information or invention (whether or not patented) resulting from the research authorized by this contract, including the right to reproduce, disclose to others, and publish all such information or inventions, and including the right to make, use and sell thereunder, and (2) a royalty-free license to use any information or invention to which RFC or its nominees are entitled under the provisions of paragraph 5 above, including the right to reproduce, disclose to others, and publish all such information or inventions, but limited to the utilization of the same in the production, use or sale of general purpose synthetic rubber suitable for use in the manufacture of transportation items such as tires or camel-back, and (3) a royalty-free license with respect to any information or invention made available under the provisions of paragraph 6 above, limited to the utilization of the same in the manufacture, use or sale of rubberlike polymers, copolymers, mixed polymers and interpolymers of the compositions defined in paragraph 3 above.

It thus appears that the Research Contract provided for a general scope of work set forth in paragraph 3, and a requirement of prior authorization by the government as to work on which reimbursement was sought. The contract also required: 1) General's disclosure to the government and its nominees of any information within the scope of the work as set forth in paragraph 3 resulting from General's authorized research work (¶ 4 & ¶ 7(1)). 2) General's disclosure to the government and its nominees of any information within the scope of work, regardless of whether or not it was derived from reimbursed research (¶ 5). 3) General's disclosure to RFC and its nominees of any information in the possession of General outside the scope of the research contract but which is necessary in the use of information submitted in the production of rubber-like polymers but excluding information pertaining to subsequent compounding of synthetic rubber.

We believe that General's invention was exactly the sort of research and de-

velopmental work which was contemplated by the contract. The scope paragraph (¶ 3), says clearly:

"The scope as above indicated excludes any work under or related to Contractor's 'wet smear' invention, covered by Patent No. 2,441,090, but includes carbon black masterbatches and may be further extended by mutual agreement in specific instances."

As we have noted, the parties to this litigation have stipulated as to the meaning of "masterbatch":

"(A masterbatch rubber being rubbery polymer plus one or more but less than all compounding materials)."

Further, it is beyond dispute from this record that this invention is practiced commercially in the very synthetic rubber plants which the government built and as to one which it hired General first as operator-manager and then as research agent.

In addition, it is clear that General claims that its patent applies when the invention is practiced in synthetic rubber plants.

We hold that General's invention was within the scope of the Research Contract as set forth in paragraph 3.

We emphasize that our decision upon this Research Contract issue is based upon the explicit and unambiguous language of the contract itself, particularly that of paragraph 3 quoted above, and paragraphs 5 and 7(2) below:

5. Contractor shall also promptly report and make fully available to RFC or its nominees all information within the scope, as defined in paragraph 3 above, of the research conducted for RFC hereunder (whether patented, patentable, or unpatentable, and irrespective of whether resulting from work reimbursed by RFC) developed or acquired from any source during the term of this contract by Contractor or its Subsidiaries and Affiliates (Companies in which Contractor now has or may in the future acquire, directly or indirectly, fifty per cent

(50%) or more of the stock having the right to vote for directors).

\* \* \* \* \* \*

7. Contractor hereby grants to RFC and its nominees \* \* \* (2) a royalty-free license to use any information or invention to which RFC or its nominees are entitled under the provisions of paragraph 5 above, including the right to reproduce, disclose to others, and publish all such information or inventions, but limited to the utilization of the same in the production, use or sale of general purpose synthetic rubber suitable for use in the manufacture of transportation items such as tires or camel-back,

. . . .

We can only construe paragraph 5 as requiring disclosure of the invention ("irrespective of whether resulting from work reimbursed by RFC") to RFC and to Firestone as an RFC nominee.

Similarly the plain language of paragraph 7(2) constitutes a grant from General of a royalty-free license to RFC and Firestone as RFC's nominee to use General's invention "in the production, use or sale of general purpose synthetic rubber suitable for use in the manufacture of transportation items such as tires." General's invention clearly was a "general purpose synthetic rubber suitable for use . . . in tires . . . ."

We are, of course, in as good a position to construe the actual contract language as was the District Judge. We find no ambiguity in this contract, and as written and executed, it is complete. The District Judge's holding that the contract was ambiguous and required extrinsic evidence for proper interpretation we believe to be erroneous as a matter of law.

We also hold that the District Judge's interpretation of the contract requiring Firestone to prove that General's invention was derived from reimbursed work was erroneous as a matter of law. To hold otherwise would require us simply to excise from the contract the whole of paragraph 5 and sub-paragraph 7(2).

There are many astonishing interpretations of this Research Contract con-

tained in the findings of fact prepared by General Tire's attorney and adopted by the District Judge. To the degree that they purport to be construction of the contract itself and are in conflict with the holdings above, we deem them to be errors of law. To the degree that these findings are based upon extrinsic evidence, we hold as a matter of law that such evidence was not competent to vary the terms of this unambiguous contract. Local 783, Allied Industrial Workers v. General Electric Co., 471 F. 2d 751, 757 (6th Cir. 1973); Gesing v. Grand Rapids Hardware Co., 362 F.2d 363, 366 (6th Cir. 1966); Calderon v. Atlas Steamship Co., 170 U.S. 272, 280, 18 S.Ct. 588, 42 L.Ed. 1033 (1898). *See* 3 A. Corbin, Contracts § 573 et seq. (1951); 9 J. Wigmore, Evidence § 2400 et seq. (3d ed. 1940).

We recognize the trend toward liberality in the admission of oral evidence concerning the negotiations which led to the execution of a contract. Restatement of Contracts, § 235(d), for example, states, "All circumstances accompanying the transaction may be taken into consideration. . . ."

*See also* 3 A. Corbin, Contracts § 579, at 414–20 (1960); 9 J. Wigmore, Evidence § 2430, at 98–99 (3d ed. 1940); Airborne Freight Corp. v. McPherson, 427 F.2d 1283 (9th Cir. 1970); Pacific Gas & Electric Co. v. G. W. Thomas Drayage & R. Co., 69 Cal.2d 33, 69 Cal. Rptr. 561, 442 P.2d 641 (1968). Although we view the District Judge's admission of extrinsic evidence to have been favorably inclined toward General Tire, we do not find it necessary to pass on every ruling he made excluding extrinsic evidence proffered by Firestone. General Tire's evidence did not in our view serve to alter the conclusion (stated above) that this contract as executed was complete and unambiguous, and hence not subject to interpretation by parol evidence.

### The Fraud Charges

Much of this record consists of charges of fraud and bad faith brought by General against Firestone, particular-

ly in connection with Firestone's prosecution of the Baltimore case and by Firestone against General in connection with General's assignment of the patent in suit to its wholly-owned subsidiary Pneuss of Brazil.

The judge who heard the Baltimore case entered findings contrary to General's charge that Firestone fraudulently created diversity jurisdiction by undertaking to carry the costs of litigation of its co-plaintiff, McCreary Rubber Co. Nor did the Fourth Circuit enter any findings of fraud when it ordered the transfer of the Baltimore case to Cleveland. Under these circumstances we think that the District Judge in the United States District Court in Cleveland, before whom the alleged fraud was not practiced, should not have proceeded to determine such charges.

As to General's assignment of the patent in suit to Pneuss, this in our view represents only one of many evasive measures indulged in by General to escape the effect of its obligations under the Research Contract which it had signed. No findings adverse to General in this or other issues have been entered by the District Court, and we have no inclination to remand any part of this altogether too lengthy litigation for any further proceedings of any kind. Neither party to this litigation has reached this point with the clean hands required for extraordinary equitable relief.

The judgment of the District Court, dated October 3, 1972, is affirmed as to paragraphs 1, 2, 3 and 4.

The judgment of the District Court, paragraph 5, is reversed and it is held that Firestone as a nominee of the Reconstruction Finance Corporation has a royalty-free right to practice and use the patent in suit.

Paragraphs 6, 7, 8, 9 and 10 are vacated.

The judgment of the District Court finding Firestone guilty of fraud in the Baltimore case is vacated.

Since neither party prevailed in the entirety, each will pay its own costs and attorney fees.