511 So.2d 1164 (1987)
STATE of Louisiana
v.
Clyde Alton CHARLES.
No. 86 KA 0969.
Court of Appeal of Louisiana, First Circuit.
June 1, 1987.
Rehearing Denied July 20, 1987.
*1165 Robert Glass, New Orleans, for defendant and appellant Clyde Alton Charles.
Paul E. Brown, Asst. Dist. Atty., Houma, for plaintiff and appellee State of La.
Before SAVOIE, CRAIN and JOHN S. COVINGTON, JJ.
SAVOIE, Judge.
Clyde Alton Charles was charged by grand jury indictment with aggravated rape in violation of LSA-R.S. 14:42. Defendant pled not guilty. Following trial by jury, he was convicted as charged. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
From this conviction, defendant appeals urging eight assignments of error:
1. The trial court erred in denying defendant's motion to suppress identification.
2. The trial court erred in denying defendant's motion to suppress custodial statements.
3. The trial court erred in failing to grant a mistrial where there was a serious variance between a police officer's testimony during the pre-trial hearing on the motion to suppress and his testimony at trial.
4. The trial court erred in admitting evidence for which there was no proper chain of custody.
5. The trial court erred in denying defendant's motion to quash the jury panel.
6. The trial court erred in excusing for cause jurors Harding, Thompson, Chauvin and Benoit.
7. The trial court erred in failing to excuse juror Thibodeaux for cause.
8. The trial court erred in permitting the prosecutor to refer to facts not in evidence during closing argument.
Assignments of error numbers three through eight are not briefed and, therefore, are considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
On March 12, 1981, a black man brutally raped a white woman. The rape occurred in the early morning off Grand Caillou Road in a commercial area located south of Houma. The victim, a twenty-six year old nurse, testified that she left her parents' home between 2:00 a.m. and 3:00 a.m. to watch the tugboats and think. While en route, her car experienced a blowout which left her vehicle stranded on the railroad tracks behind Grand Caillou Road. The victim abandoned her car and started walking toward Houma, hoping to find a telephone. The weather was clear, and business signs lighted her way. As the victim neared Gino's Restaurant after having walked for about twenty to thirty minutes, she noticed a man approaching her. After exchanging greetings, the man reversed his direction and began walking beside the victim while engaging her in conversation. The victim told the man, later identified as defendant, of her automobile's disability. She also indicated that she was meeting friends at Gino's Restaurant because she did not want him to know that she was really alone. The victim became increasingly more uncomfortable as the man made suggestive remarks about her physical appearance. The man grabbed the victim by the neck and dragged her from the roadway after she warned him that she had a gun inside her purse. As the victim screamed and struggled, the man punched her in the face, verbally threatened her, pulled her hair, and dragged her behind some tanks. Then he raped her after ordering her to remove her pants, stockings, and underwear. After completing the sexual assault, the man allowed the victim to go to the bathroom. The victim walked toward the roadway, noticing that the man was not following her. As she escaped, it seemed to her that the rapist was heading back in the direction in which she first saw him walking. She noted that her encounter with the rapist lasted about thirty minutes.
A short time after the rape, Terrebonne Parish Deputy Harold Domangue passed *1166 the victim on Grand Caillou Road. The victim was visibly upset and evidenced signs of having been involved in a physical struggle. She told Domangue that she had been raped by a black man who might still be in the vicinity.
Deputy Domangue testified at trial, recounting his activities that night. At 2:25 a.m., Domangue noticed a hitchhiker on Grand Caillou Road near Gino's Restaurant. Domangue got out of his car and ordered the man to stand by the side of the road, as he was creating a traffic hazard. Domangue knew the hitchhiker as Clyde Charles and talked with him for about five minutes before continuing on his rounds. At about 3:20 a.m., Domangue located the victim's abandoned car on the railroad tracks. He continued on his scheduled route before returning to Grand Caillou Road where he found the victim. Domangue then called for backup and questioned the victim about her assailant. The victim told Domangue that the rapist was a black man. At that time, she was still too upset to provide further details. However, Domangue obtained a description of the rapist's clothing by asking the victim to agree or disagree that her assailant was wearing certain items of clothing he described to her. Domangue already suspected Clyde Charles might be the rapist and included a description of Charles' clothing in his questioning of the victim. The victim's responses corroborated Domangue's hypothesis.
Meanwhile, Lt. Ronald Bergeron responded to Domangue's request for assistance and searched the crime scene. He found a blue denim jacket fifty feet from the highway and the victim's purse approximately thirty feet from the highway. Behind storage tanks where the rape occurred, Bergeron found a red baseball cap. Based on information provided by Domangue, Bergeron searched the area for Clyde Charles. He located defendant at 4:05 a.m., hitchhiking on Grand Caillou Road about one mile south of the rape site. Defendant was advised of his Miranda rights and placed under arrest. Defendant was then transported to Terrebonne General Hospital where the victim positively identified him as her assailant at about 4:30 a.m.

ASSIGNMENT OF ERROR NUMBER TWO (Argument one in brief):
By means of this assignment, defendant contends that the trial court erred by failing to suppress custodial statements made by him.
The record reveals that, after the victim identified defendant, Lt. Bergeron took defendant downtown for booking. Detective Larpenter and Lt. Walling, the evidence custodian, left the hospital for the crime scene. There Larpenter and Walling located and collected the purse and the coat previously found by Lt. Bergeron on the shoulder of the road. Behind the tanks where the rape occurred and in general proximity to the blue denim coat and the victim's purse, they recovered a red baseball cap.
Domangue testified at trial that the hitchhiker was wearing a blue denim jacket tied around his neck and a red cap. The victim remembered the rapist had something with sleeves tied around his neck. However, as the victim escaped she noticed that her assailant no longer had an article of clothing tied around his neck. When Bergeron arrested defendant, he had neither a coat nor a hat.
At approximately 7:00 a.m., Larpenter and Walling returned to the Detective Bureau of the Terrebonne Parish Sheriff's Office. In Lt. Walling's presence, Larpenter booked defendant for the rape. He read the Miranda rights from a card. In response to the explicit advisement, defendant stated that he did not wish to give a "written statement or anything". Larpenter did not fill out a rights of arrestee form because defendant did not want to give a statement.
Immediately after the police booking, Larpenter and Walling accompanied defendant to the jail. Defendant was booked into the jail, and Larpenter read defendant his Miranda rights from a card a second time. Defendant again declined to give a statement. Larpenter and Walling then moved defendant into the changing room of *1167 the jail where they intended to collect his clothing for evidence when he changed into prison clothes. According to Larpenter, he asked defendant two questions in the changing room while defendant was giving his clothing to Walling. The first question and answer were: "I had asked him if he had a cap, or if he wanted his cap back, at which time he stated he didn't [have one]." Larpenter followed with the second question: "I then asked him if he was wearing a sweater or coat, and he asked me ... he asked me was it blue."
In denying the motion to suppress defendant's responses, the trial court stated:
As I recall the statement that was made, it was not an interrogation at all. I think the police was [sic] merely trying to inquire as to whether by some positive statement that some article of clothing belonged to himprobably to assimilate all of the clothing into a box to send to the Crime Lab. I can't see any questioning that went on after, no interrogation at all.
To the contrary, these events, during which defendant made incriminating statements shortly after having asserted his right to silence, indicate a violation of the prophylactic rules established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
In the instant case, defendant was subjected to express questioning. Moreover, Larpenter, who had recovered the jacket and hat from the rape site, should have known that the conversation was reasonably likely to elicit an incriminating response from defendant. See Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We do not agree with the trial court's conclusion that Larpenter's inquiries were somehow those normally attendant to arrest and custody. See 100 S.Ct. at 1689.
When the accused invokes his right to silence, Miranda does not erect a complete bar to further police initiative in communications as it does after a request for an attorney. State v. Loyd, 425 So.2d 710 (La.1982). Nevertheless, the police must scrupulously honor the right to cut off questioning by the person in custody. See Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The facts of this case indicate that the police engaged in conduct in obtaining an incriminating statement which destroyed defendant's confidence in his right to cut off questioning.
However, the finding of a Miranda violation does not end our inquiry. In light of Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), wherein the supreme court held subject to the harmless error rule the admission of a confession obtained from a defendant in violation of his Sixth Amendment right to counsel, lower courts have agreed that the harmless error rule also applies to the admission of statements obtained in violation of Miranda. See e.g., Harryman v. Estelle, 616 F.2d 870 (5th Cir.), cert. denied, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980); State v. Jones, 386 So.2d 1363 (La.1980).[1] The record in this case reflects no indication that defendant's statement was involuntary. Defendant does not claim that it was.
The question of whether or not a constitutional error was harmless cannot be answered by considering the error in isolation. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It is thus necessary to review the facts of the case and the evidence adduced at trial to determine the effect of the unlawfully admitted evidence upon the other evidence adduced at trial and upon the conduct of the defense. A court must then decide if, absent the so determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt. See Chapman v. California, supra.
Although we recognize that this is an exacting standard, we have no difficulty in *1168 concluding that it was satisfied herein. There is no question that the statement admitted against defendant in the state's case-in-chief was incriminating. But that statement had no effect on the other evidence adduced against defendant at trial. That a rape occurred is not disputed. The victim unequivocally stated that she had been raped by a black man. This rape was physically corroborated by the victim's physical condition, which included evidence of active spermatazoa from a vaginal swab. In addition, there existed overwhelming evidence of defendant's identity as the perpetrator. The victim positively identified her assailant shortly after having observed him at close range for about thirty minutes and testified that he may have told her his name was Clyde. Although defendant presented witnesses who attempted to account for his location during the critical time frame, that testimony was inconsistent with Deputy Domangue's previous sighting of defendant in the immediate vicinity of the crime scene. In addition, it is plain that the erroneous admission of the statement had no effect on the conduct of the defense. Defendant's brother Mario testified that he, rather than defendant, was hitchhiking near Gino's Restaurant and was approached by Deputy Domangue. Moreover, defendant testified on his own behalf and denied having a jacket or hat with him that night. Under these circumstances, the disputed statement would have been properly admissible for impeachment. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).
Thus, although the trial court erred by not granting the motion to suppress, the evidentiary consequences of this ruling resulted in harmless error.

ASSIGNMENT OF ERROR NUMBER ONE (Argument two in brief):
By this assignment, defendant contends that the trial court erred by failing to grant a motion to suppress the victim's out-of-court identification of defendant as the rapist.
In defendant's pre-trial motion to suppress, he urged that the identification should be suppressed because it was unduly suggestive. That motion was denied by the trial court, and defendant has not argued that ground on appeal. At trial, after Deputy Domangue testified, defendant re-urged his motion, contending that defendant's arrest was illegal because it was not founded on probable cause. Therefore, defendant reasoned the victim's out-of-court identification of defendant was tainted by his illegal arrest. The trial court rejected the new argument and noted that, in any event, the victim's in-court identification of defendant rested on an independent basis.[2]
To support probable cause to arrest an individual, law enforcement officers must have trustworthy information that a violation of the law has been committed and that the person to be arrested committed the violation. See State v. Bickham, 404 So.2d 929 (La.1981).
In this case, Deputy Domangue arrived at the crime scene shortly after the instant rape. The victim manifested physical injuries and expressly told him that she had been raped by a black man. In addition, through Domangue's questioning, the victim was able to provide a detailed description of her assailant. Domangue knew defendant and had seen him in the immediate vicinity before the attack described by the victim. Although Domangue's method of questioning, which required yes or no answers on the part of the victim, was not entirely objective, the reliability of the information was not undercut. The victim spent some thirty minutes with her assailant at close range and at a time when her attention was necessarily focused on him. *1169 Certainly, there was probable cause to support defendant's arrest.
Moreover, as noted above, the trial court expressly found that the victim's in-court identification rested on an independent recollection of her initial encounter with the assailant. Under these circumstances, the victim's initial identification of defendant would not be a suppressible "fruit" even if police misconduct had been demonstrated. See United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980).
For the foregoing reasons, this assignment of error lacks merit.
AFFIRMED.
NOTES
[1] This situation is to be contrasted with the evidentiary consequences of a coerced confession which requires automatic reversal. See Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
[2] State v. Landry, 339 So.2d 8 (La.1976), suggests that a defendant may not seek a rehearing to introduce new evidence once a trial court denies his motion to suppress. In addition, reargument and reconsideration of the motion based on evidence previously introduced should be sparingly made and limited to instances wherein the trial court firmly believes that its prior decision was legally infirm. See State v. Thompson, 448 So.2d 666 (La.), reversed on other grounds, sub. nom. Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984).