Clyde A. CHARLES, Petitioner–Appellant,

v.

Larry SMITH, Warden, Louisiana State Penitentiary, and William J. Guste, Jr., Attorney General State of Louisiana, Respondents–Appellees.

No. 89–3300.

United States Court of Appeals, Fifth Circuit.

Feb. 20, 1990.

Francis King, Asst. Federal Public Defender, John T. Mulvehill, Federal Public Defender, New Orleans, La., for petitioner-appellant.

Paul E. Brown, Douglas H. Greenburg, Dist. Atty., Clifford Foster, Asst. Dist. Atty., Houma, La., for respondents-appellees.

LIVELY,* JOLLY and HIGGINBOTHAM, Circuit Judges.

LIVELY, Circuit Judge.

This is an appeal from denial of an application for a writ of habeas corpus. The petitioner-appellant presents two issues for review: (1) Whether his pretrial identification by the victim of a rape as the perpetrator should have been suppressed because at the time of the identification he was in custody as the result of being arrested without probable cause; and (2) whether an inculpatory statement while in custody should have been suppressed because it resulted from an arrest without probable cause and from interrogation that violated the petitioner's Fifth and Fourteenth Amendment rights as set forth in *Miranda v. Arizona.*

## I.

### A.

While on highway patrol in the early morning hours of March 12, 1981, deputy Domangue of the Terrebonne Parish, Louisiana, sheriff's office, encountered a young woman in the road who said she had just been raped. The woman was bleeding from her lip and was disheveled. She was quite upset, nearly hysterical, but after a time she said that her assailant was a black

---

* Circuit Judge of the Sixth Circuit, sitting by designation.

man and attempted to describe him. Domangue had seen Clyde Charles, whom he knew, hitchhiking along the same road a short time earlier. He asked the victim about items of clothing worn by the rapist, describing clothing that Charles was wearing when Domangue had stopped and talked with him. The victim responded affirmatively to these questions.

Domangue called for help and Lieutenant Bergeron of the sheriff's office responded. Bergeron testified at the habeas corpus evidentiary hearing that he talked with Domangue and the victim at the scene of the rape, and then left in his patrol car to try to find the rapist. Before he left, he and Domangue found a blue jacket and a woman's purse between the highway and the area, some 100 yards away, where the victim said the rape had taken place. Domangue told Bergeron the direction in which Charles was walking when he had seen him. Driving in that direction, Bergeron came upon Charles within 5 to 8 minutes. Charles was hitchhiking less than one mile from the location of the rape. Domangue had given Bergeron further description of the rapist by radio before he located Charles.

Bergeron arrested Charles, handcuffed him and advised him of his *Miranda* rights. When arrested Charles was wearing dark pants and a black cotton or velour shirt or sweatshirt with white stripes. These articles corresponded to Domangue's description of clothes Charles was wearing when he saw him hitchhiking earlier and "checked him out," and to the description that had elicited affirmative responses from the victim. Charles was not wearing a cap or jacket. A red cap was found later, along with a shoe and stocking and some car keys, in the area where the rape took place. Bergeron was not certain whether the victim spoke directly to him at the scene, or whether he got all his information from Domangue. He testified, however, that when Domangue radioed him as he was looking for the rapist, Domangue said that from the way the lady was talking, the suspect matched the description of the person he had stopped earlier and that person

was Clyde Charles, whom Domangue knew from previous contacts.

After arresting Charles, Bergeron took him to a nearby hospital where Domangue had taken the victim. After waiting in Bergeron's car for a short time, Charles was placed on the emergency ramp 10 or 15 feet from the hospital emergency door. The victim was brought to the door in a wheelchair. The area was well lighted. Detective Larpenter of the sheriff's office told the victim to look at Charles and to take her time to be sure before deciding whether he was her assailant. Bergeron testified that the victim positively identified Charles as the person who had raped her. So far as anyone could recall, Charles was the only black male present, and was the only person in handcuffs.

Larpenter testified at the evidentiary hearing that he went to the hospital where Domangue had taken the victim and that she agreed to try to identify her assailant. He did not tell the victim anything about the suspect. Charles was about 10 feet from the victim, facing her, when she positively identified him. He was wearing a dark velour type sweater with white stripes. Larpenter said the victim had stopped crying and was able to give him a description of the rapist before she saw him at the ramp.

### B.

Larpenter testified that he went to headquarters when Charles was being booked and read his *Miranda* rights to Charles from a card. After Charles was booked, he was taken to the "changing room," where he surrendered all his clothes to Gerald Walling, supervisor of the crime laboratory at the sheriff's office. Larpenter said he gave Charles *Miranda* warnings again at the changing room. At the first reading of the rights Larpenter asked Charles if he wanted to give a written statement and he answered, "No." At the second reading, Larpenter asked if he wanted to tell him anything about the case; Charles again said, "No." Nevertheless, while they were in the changing room, Larpenter asked Charles if he had a hat, and Charles an-

swered, "No." Larpenter then asked if he owned a coat. Charles responded by asking, "Was it blue?" According to all the witnesses the questioning then ended.

## II.

### A.

Charles was charged with aggravated rape. His counsel made a pretrial motion to suppress the identification by the victim at the hospital and Larpenter's questions and Charles' responses at the changing room. The grounds for the motion to suppress the identification were that Charles was not represented by counsel and that the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification" that the defendant was denied due process. The motion to suppress the statement was based upon a claimed *Miranda* violation. A state court judge conducted a hearing on the motion at which Domangue, Bergeron and Larpenter testified. At the conclusion of the hearing, the judge denied both motions. Later counsel made a motion for the police to exhibit Charles in a lineup, and the court denied this motion as well.

At the trial, Charles objected to the victim testifying about the identification at the hospital, without stating grounds. The trial judge overruled this objection. After Domangue had testified, counsel for Charles renewed his motion to suppress testimony about the victim's identification of Charles at the hospital and made a motion for a mistrial. He argued that Domangue had suggested to the victim "who to identify" by asking about the assailant's clothing. In denying this motion the trial judge, who was not the judge who had conducted the hearing on the pretrial motions, recalled that the victim had encountered her attacker in a well-lit area and had been within 2 or 3 feet of him before the attack. After the attack began they were in an area where the assailant was in clear view, and they were very close together. The victim had the opportunity to see enough of the man for 30 or 35 minutes to identify him. The judge said he did not believe she depended on anything that Domangue or anyone else told her. The trial judge stated that the victim's identification of Charles in court was independent and

based solely on her experience with him at the time of the attack. The court further stated that despite some variances, he did not believe there was serious inconsistency between Domangue's testimony at the suppression hearing and at the trial. The trial judge also accepted the determination of the motions judge that the alleged inculpatory statement by Charles at the changing room was admissible.

The jury found Charles guilty of aggravated rape, and he was sentenced to life imprisonment without privilege of parole or probation. In his appeal to the Louisiana Court of Appeals, Charles raised several issues, including the two relied upon in the subsequent habeas proceedings. In his statement of grounds for reversal, however, he argued that evidence of the pretrial identification at the hospital should have been suppressed because the identification took place while Charles was in custody following an illegal arrest—that it was "fruit of a poisonous tree." He did not rely on the absence of counsel or the suggestiveness of the identification, grounds he had asserted previously. The court of appeals noted this change of position in its opinion:

> In defendant's pre-trial motion to suppress, he urged that the identification should be suppressed because it was unduly suggestive. That motion was denied by the trial court, and defendant has not argued that ground on appeal. At trial, after Deputy Domangue testified, defendant reurged his motion, contending that the defendant's arrest was illegal because it was not founded on probable cause. Therefore, defendant reasoned the victim's out-of-court identification of defendant was tainted by his illegal arrest. The trial court rejected the new argument and noted that, in any event, the victim's in-court identification of defendant rested on an independent basis.

*State of Louisiana v. Charles*, 511 So.2d 1164, 1168 (La.App.1987).

The Louisiana Court of Appeals found that none of the assignments of error had merit, and affirmed Charles' conviction. After the court of appeals denied rehear-

ing, the Louisiana Supreme Court denied an application for a writ of certiorari.

### B.

In his application for a federal writ of habeas corpus, Charles presented the two issues previously described. With respect to the pretrial identification issue, he clearly relied only on the alleged illegality of his arrest as the basis of his claim that admission of the evidence abridged his right to due process. The respondent replied to the application by arguing that there was an abundance of probable cause for Charles' arrest. Charles then responded with a brief arguing that the arrest was made without probable cause, and referring only tangentially to the suggestiveness of the show-up. The federal magistrate to whom the habeas case was referred appears to have revived the claim of unnecessary suggestiveness *sua sponte*. Although the magistrate discussed the issue of suggestiveness of the pretrial identification, he did not make a finding on this issue. He noted that the state court found that the victim's in-court identification of Charles was based on an independent recollection of the events of March 12, 1981, and then rested his recommendation to deny relief on the identification issue squarely upon a finding that there was probable cause for Charles' arrest.

In his motion for review of the magistrate's findings and recommendations, Charles' attorney again argued that the officers did not have probable cause to arrest Charles on the highway. After a full discourse on probable cause, counsel discussed the suggestiveness of the show-up, not as an independent basis for suppression, but apparently as an additional argument against its admission because of the claim that Charles was illegally in custody.

The district court adopted the magistrate's findings and recommendations on the identification issue "and for reasons stated therein finds there was probable cause to support Defendant's arrest...." With respect to the *Miranda* issue, the district court concluded that the "blue jack-

et" response was incriminating, and that it had been elicited in violation of the petitioner's constitutional right to remain silent. The district court concluded, however, that the error was harmless in view of the victim's ample opportunity to observe her attacker and the state court's finding that her in-court identification of Charles was completely independent of her identification of him at the hospital.

In his application for a certificate of probable cause, Charles' counsel again presented the identification issue in terms of taint flowing from a warrantless arrest without probable cause. Counsel then stated "in addition" that the procedures were suggestive. Counsel refined his argument further in briefing for this court. He first contended that the arrest was illegal because the officers lacked probable cause, and then argued, "in addition," that the magistrate found the identification at the hospital was made under unnecessarily suggestive circumstances, but erred in finding that under the totality of the circumstances, evidence of the identification was admissible.

### III.

■ Our first task is to determine what questions have been presented properly for review by this court. There is no problem with the *Miranda* issue; it has been argued consistently at every stage of the proceedings since the pretrial motion to suppress in the state court. This is not the case, however, with the identification issue. Two questions were raised about the identification at the hospital in the pretrial motion to suppress. Counsel asserted that the evidence should be suppressed because Charles did not have counsel at the time and because the procedures followed were unnecessarily suggestive. After both the motions judge and the trial judge overruled the motions to suppress, Charles' counsel abandoned the lack of counsel and suggestiveness claims and preserved only a claim that Charles was illegally in custody. As noted, the Louisiana Court of Appeals found that Charles relied solely on lack of probable cause for his arrest, thus render-

ing his custody illegal, as the basis of his appellate argument that the pretrial identification should have been suppressed "and has not reargued that ground [undue suggestiveness] on appeal." *State of Louisiana v. Charles*, 511 So.2d at 1168. Further, in his petition to the Louisiana Court of Appeals for a rehearing, Charles filed a brief that raised only the claim of lack of probable cause for his arrest in arguing the identification issue.

Judge Wisdom recently wrote for this court that "on habeas review federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as all factual allegations supporting those grounds." *Knox v. Butler*, 884 F.2d 849, 852 n. 7 (5th Cir.1989). The claim of undue suggestiveness was not presented to the Louisiana Court of Appeals as a ground for reversing Charles' conviction. Therefore, it was not a proper basis for consideration in determining whether Charles was entitled to a writ of habeas corpus. We note also that it was not one of the claims set forth in petitioner's *pro se* application for habeas corpus. After a federal public defender was appointed to represent Charles, that attorney never sought to amend the application or otherwise to attempt to raise the claim of suggestiveness.

We will consider the identification issue solely on the properly preserved ground that Charles was in custody as the result of an illegal arrest at the time of the pretrial identification. In truth, Charles has never argued undue suggestiveness as an independent ground for relief since abandoning that claim before his first state appeal.[1]

## IV.

In view of Charles' treatment of the issues, we conclude that the following questions are properly presented for review by this court: (1) Whether the victim's pretrial identification and the petitioner's inculpatory custodial statement should have been suppressed because the petitioner was in custody as a result of an arrest without probable cause, and (2) whether the petitioner's inculpatory custodial statement should have been suppressed because it resulted from an interrogation in violation of *Miranda v. Arizona.*

Charles argues that Bergeron did not have probable cause for an arrest when he encountered him on the highway about one mile from the scene of the rape. He contends that the evidence did not satisfy the requirements for a warrantless arrest set forth by the Supreme Court in *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964): "[W]hether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

We believe the evidence in this case satisfies the *Beck* standard. Charles argues that there were inconsistencies in the testimony of the officers at the various hearings which render their testimony unreliable. We have examined each of the transcripts carefully and do not believe the inconsistencies are critical. Domangue testified both at the hearing on the pretrial suppression motion and at the trial. Despite defense counsel's extensive cross-examination in an attempt to show significant differences between the witness' two versions, Domangue's testimony appears to be consistent in all material respects. On both occasions he described his encounter with Charles, whom he knew from previous contacts, prior to discovering the victim a short time later. He described Charles' clothing, particularly the dark shirt or

---

**1.** There is no question of exhaustion of state remedies as required by 28 U.S.C. § 2254(c) (1982). Charles did argue the question of a due process violation resulting from admission of evidence of the pretrial identification at every available stage of state proceedings. He presented the same two constitutional questions to the district court that he had argued at each level of the Louisiana court system. He dropped one of the grounds raised in the trial court with respect to one of the questions, however, in the presentation of his state appeal.

sweater with white stripes, the jacket tied around his neck and the red cap.

■ At the pretrial hearing Domangue stated that the victim gave a description of her assailant and of his clothing. At trial, he repeated this testimony on direct examination, and agreed on cross-examination that the victim described the rapist's clothing by answering affirmatively his questions that actually contained the descriptions of clothing he had observed Charles wearing. On both occasions he testified that the victim was extremely upset when he first found her, but eventually was able to describe her attacker and to respond to his questions. On both occasions he gave consistent descriptions of the location of the crime and stated that Charles had the sleeves of a blue jacket tied around his neck and was wearing a red cap when he saw him earlier.

Domangue did not testify at the habeas evidentiary hearing. Bergeron did testify, and Charles attempted to impeach his testimony by showing that it was inconsistent with his statements at the trial. The habeas hearing took place more than six years after the trial. The only real inconsistency uncovered by persistent cross-examination concerned whether it was Domangue or the victim who described the rapist and his clothing to Bergeron. It appears from reading both transcripts that Domangue actually supplied the information to Bergeron. What is important is that Bergeron knew at the time of the arrest that a woman had been raped just a short time earlier, that the assailant was wearing dark pants and a dark sweater or shirt with white stripes, and the direction in which the rapist had gone on foot after the attack. He also knew that Domangue had stopped and talked with Charles, who was hitchhiking, a short time before the rape occurred.

When Bergeron found Charles again hitchhiking on the highway less than one mile from the scene of the crime, headed in the same direction as when Domangue had seen him earlier, and wearing clothing that matched the description given him by Domangue after Domangue had received confirmation from the victim, he had probable cause to believe Charles had committed the crime. Charles was not wearing a jacket or a cap when Bergeron arrested him but Bergeron testified that he had seen a blue jacket and a purse near the scene of the rape before he left to look for the perpetrator. A red cap was found in the area later. Bergeron also testified that after he left Domangue and the victim to look for a black male answering the physical description of the attacker, Domangue told him by radio that the information he was getting from the victim matched the description of the person Domangue had checked out earlier, and he gave Bergeron Charles' name.

■ This court applies the "collective knowledge doctrine" in determining probable cause for an arrest in two types of cases. First, if the arresting officer has no personal knowledge of any of the facts establishing probable cause, he may make an arrest in carrying out directions from another officer who does have probable cause. Second, if an arresting officer has personal knowledge of some facts that do not, standing alone, establish probable cause but, "when added to information known by other officers involved in the investigation, tips the balance in favor of the arrest," he may make an arrest. *United States v. Webster*, 750 F.2d 307, 323 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).

Assuming Bergeron received all his information about the rapist and Charles' earlier presence in the area from Domangue, this case comes under the first branch of collective knowledge. Domangue clearly would have had probable cause to arrest Charles at the place where Bergeron found him. If, on the other hand, we assume that the victim supplied some of the facts known by Bergeron, the "laminated total" of Bergeron's and Domangue's information was sufficient to constitute probable cause under the second branch. *Id.* at 323.

The district court correctly found that Bergeron had probable cause to arrest Charles. Thus, Charles was legally in custody when the victim identified him at the hospital and when Charles made an inculpa-

tory statement. Charles was not entitled to habeas relief on the claim that the pretrial identification and statement were tainted by an illegal arrest.

## V.

Detective Larpenter asked Charles two questions while he was in custody, after Charles had received *Miranda* warnings and had declined to give either a written or oral statement. First, Larpenter asked Charles if he had a hat, and Charles said "No." Then Larpenter asked if he had or owned a coat or if he wanted his coat and Charles responded, "Was it blue?" Larpenter testified that whereas Charles had exercised his right to remain silent while being booked, when he arrived at the changing room Charles was talking to other inmates and "jiving" with them. He contended that Charles broke his silence before the two questions were asked. Charles denied that he spoke first, and testified that he was taken to the changing room after about ten minutes in the holding cell and that Larpenter began questioning him as he undressed.

## A.

Because Larpenter's questions were "reasonably likely to elicit an incriminating response," *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980), they must be considered in light of *Miranda's* proscriptions. Charles contends that once he exercised his right to remain silent after receiving *Miranda* warnings, no subsequent statement could be admitted unless the court finds that he initiated further discussions, citing *Edwards v. Arizona*, 451 U.S. 477, 484, 485, 101 S.Ct. 1880, 1884–85, 1885, 68 L.Ed.2d 378 (1981). Charles' reliance on *Edwards* is misplaced. In *Edwards*, the Supreme Court held that once a person in custody advises the police during interrogation that he desires counsel, that person may not be questioned further "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451

U.S. at 485, 101 S.Ct. at 1885. In the present case, however, Charles never expressed a desire for counsel; he merely declined to give either a written or oral statement.

We believe this case is governed by *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In *Mosley*, a suspect was questioned about some robberies while in a cell. When he said he did not want to answer any questions about the robberies, the officer promptly ceased the interrogation. The suspect did not ask for a lawyer. Several hours later a different officer took the suspect from the cell block where he had been questioned previously to an officer, gave new *Miranda* warnings, and began questioning him about a homicide that had occurred during an earlier holdup. Eventually the suspect made a statement implicating himself in the killing. He never requested a lawyer or indicated that he did not want to discuss the homicide with the second officer. *Id.* at 97–98, 96 S.Ct. at 323–24.

The Supreme Court held that admission of the incriminating statement did not violate *Miranda*. Nothing in *Miranda* created "a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03, 96 S.Ct. at 326 (footnote omitted). The Court enunciated the rule for determining admissibility of statements obtained after a person in custody has not requested a lawyer but has decided to remain silent and interrogation is resumed at a later time: It "depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 S.Ct. at 326 (footnote omitted). The Supreme Court has explained the different applications of the "bright-line" rule of *Edwards*, where a lawyer is requested, and the *Mosley* rule requiring further inquiry where there is no request for counsel. See *Arizona v. Roberson*, 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988).

When a suspect does not request counsel, but only halts police interrogation by

asserting the right to remain silent, if an inculpatory statement is elicited in later questioning, the court must examine the record in each case to determine whether the police "scrupulously honored" the detainee's right to cut off questioning. This case-by-case treatment can produce opposite results in cases that are similar in some respects. Compare *United States v. Hernandez*, 574 F.2d 1362 (5th Cir.1978) (*Miranda* violation) with *Kelly v. Lynaugh*, 862 F.2d 1126 (5th Cir.1988) (no *Miranda* violation).

■ In the present case the officer asked the two questions just a few minutes after Charles had declined for the second time to give a statement, not hours later as in *Mosley* and *Lynaugh*. Further, the same officer questioned Charles about the same crime that he had refused to discuss a short time before. Larpenter testified that he used "psychology" on Charles in asking about a hat and coat, hoping to get an admission. We do not believe, under these circumstances, that Larpenter "scrupulously honored" Charles' right to remain silent. Thus, as the district court found, the state trial court committed constitutional error on admitting testimony of the questions and Charles' responses.

### B.

■ The district court found the *Miranda* violation to be harmless error, and we must review this determination under standards set by the Supreme Court. The question in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), was whether the admission of evidence obtained by means of an illegal search and seizure was harmless error. In such a case, the Supreme Court held, "the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 86–87, 84 S.Ct. at 230. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Court stated that "[a]n error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived as harmless." *Id.* at 23–24,

87 S.Ct. at 828. The *Chapman* Court prescribed the rule that controls our inquiry: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. at 828.

Larpenter testified at trial, that in response to his question about a hat, Charles denied having one. Even though Larpenter should not have been permitted to testify on this question and answer, the admission of this testimony was harmless error because the answer was not incriminating. This testimony did not contribute to Charles' conviction.

Larpenter's testimony concerning Charles' response to his question about a jacket poses a more difficult problem. Larpenter testified that Charles responded, "Was it blue?" This response indicated some knowledge of a blue jacket. Domangue had testified that Charles had a blue jacket tied around his neck when he saw him earlier, and the police recovered a blue denim jacket in the area of the crime. Thus, we consider his answer inculpatory.

If the blue jacket had been the key factor in any witness' identification of Charles, we would be unable to say that the admission of the evidence was harmless error. That is not the case, however. The article of clothing that each witness remembered most distinctly was the dark sweater or sweat shirt with white stripes. Domangue said Charles was wearing such a shirt when he saw him earlier; the victim said he was wearing such a shirt when he raped her; and Charles was wearing a shirt that fit this description when he was arrested about 30 minutes after the crime and less than one mile away. Furthermore, a laboratory examination of the shirt revealed hairs that microscopically matched characteristics of the victim's hair. The clothing exhibit that tied Charles to the crime was his dark shirt with white stripes, not a blue jacket that may or may not have been his.

The evidence related to the sweater or sweat shirt only confirmed the victim's memory of Charles' physical characteristics. The victim's car had a blowout be-

tween 2:00 and 3:00 a.m. She was walking along the highway looking for a place where she could find a telephone when she met her assailant walking toward her. She testified that he turned around and followed her, asking what she was doing there alone at that time of night. He circled her twice as she walked, and made several suggestive remarks. He told her his name was Clyde as he walked along, and when she did not respond to his advances he dragged her off the road. She testified that the assailant forced her to the ground not far from the road, but that there was a fair amount of light there. After striking and threatening her, he dragged her some distance away from the highway to an area behind some tanks and raped her there.

The victim, who was 27 years old and a licensed practical nurse, testified that there was sufficient light both on the road and at the first place the man threw her to the ground for her to get a good view of her assailant. The state trial court emphasized her opportunity to observe the rapist in finding that the victim's identification at the hospital and her in-court identification of Charles were based solely on her memory of the events surrounding the rape. We believe the testimony of the victim, in conjunction with that of the officers, convinced the jury that Charles was the rapist, and that Larpenter's testimony concerning Charles' response to his question did not contribute to the conviction. During closing argument the prosecutor did not even refer to Larpenter's testimony concerning Charles' response to the question about a jacket.

We believe that if the jury considered the presence of the blue denim jacket significant it was because Domangue testified that Charles was wearing such a jacket immediately before the crime, and the sheriff's office found such a jacket at the scene. Therefore, we are convinced beyond a reasonable doubt that admission of Larpenter's testimony in this regard was harmless error.

The judgment of the district court is AFFIRMED.