USCA1 Opinion

 

 October 19, 1992 October 19, 1992 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ ____________________ No. 91-2251 No. 91-2251 UNITED STATES OF AMERICA, UNITED STATES OF AMERICA, Appellee, Appellee, v. v. JAMES W. McCOY, JAMES W. McCOY, Defendant, Appellant. Defendant, Appellant. ____________________ ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, U.S. District Judge] [Hon. Shane Devine, U.S. District Judge] ___________________ ____________________ ____________________ Before Before Torruella, Cyr and Boudin, Torruella, Cyr and Boudin, Circuit Judges. Circuit Judges. ______________ ____________________ ____________________ Glenn G. Geiger, Jr. with whom Geiger & Heiser, P.C. was on brief Glenn G. Geiger, Jr. with whom Geiger & Heiser, P.C. was on brief ____________________ _____________________ for appellant. for appellant. Michael J. Connolly, Assistant United States Attorney, with whom Michael J. Connolly, Assistant United States Attorney, with whom ___________________ Jeffrey R. Howard, United States Attorney, was on brief for appellee. Jeffrey R. Howard, United States Attorney, was on brief for appellee. _________________ ____________________ ____________________ ____________________ ____________________ CYR, Circuit Judge. After defendant James W. McCoy was CYR, Circuit Judge. _____________ indicted on four counts of violating 18 U.S.C. 922(g)(1), which makes it unlawful for a convicted felon to possess a firearm, he filed three motions to dismiss the indictment and two motions to suppress evidence of the firearms. The motions were denied and McCoy was tried and convicted on all counts. He challenges only the district court orders denying the pretrial motions. We affirm. I I BACKGROUND BACKGROUND __________ Between July 21 and August 14, 1987, the town of Hampton Falls, New Hampshire was beset by a series of burglaries which seemed linked by several similarities. Each occurred during working hours on a weekday. In each instance, entry was gained by prying open a door, or if an attempted entrance through a door proved unsuccessful, by prying open a window. Typically, jewelry, cash, tools, and other small personal items were carried away in pillow cases and nylon bags. A. Allen Burglary A. Allen Burglary ______________ On August 14, 1987, the Hampton Falls home of John Allen was burglarized. At approximately 1:30 p.m., George Allen, John Allen's brother and neighbor, spotted an unfamiliar black Dodge van parked near John Allen's home. He stopped to investi- gate, and noticed a white male walking away from the back of his brother's house. He asked the stranger what he was doing, and the man, who appeared nervous, replied, "just surveying." The man then shouted toward the tree line at the back of the proper- ty, as if to another person, words to the effect that he would finish the job later. The man then got into the van, and George Allen remarked to him that if he was simply surveying, he would not object to his license plate number being recorded. George Allen recorded the number, and the man drove away in the black van. When John Allen returned home that evening, he discov- ered that his house had been forcibly entered through a rear cellar window and an unsuccessful attempt had been made to pry a rear door. Although it appeared that nothing had been taken from the house, a nylon bag packed with jewelry and other personal items was found in the master bedroom. Hampton Falls Deputy Police Chief Dean R. Glover was dispatched to investigate the burglary. George Allen told Glover that the man he had seen that afternoon was a white male with dark curly hair, between five feet ten inches and five feet eleven inches tall, and between one hundred and seventy and two hundred pounds. Allen initially estimated the man's age at between twenty-five and thirty years, but moments later revised his estimate to thirty-five years or older. B. Arrest Warrant B. Arrest Warrant ______________ 2 Deputy Chief Glover ran a check on the license plate number provided by George Allen and discovered that the van was registered to appellant James W. McCoy at an address in neighbor- ing Hampton, New Hampshire. Glover then ran a license check, which revealed that McCoy was forty years old, five feet eleven inches tall, two hundred pounds, with brown hair and eyes. Armed with this information, Glover prepared an affidavit and complaint for an arrest warrant charging McCoy with burglary. The support- ing affidavit described the burglary of the John Allen residence and George Allen's encounter with "a white male individual, heavyset, approx. 5'10 ", dark medium-length hair, blue shirt and dark pants." The affidavit included other descriptive informa- tion obtained through the motor vehicle registration and license check: "Hgt 5'11", wgt 200 lbs." The complaint and supporting affidavit were submitted to a Justice of the Peace, who issued the arrest warrant. C. Subsequent Events C. Subsequent Events _________________ Deputy Chief Glover contacted the Hampton police and arranged to have two Hampton police officers, detectives Lalley and Wardle, accompany him to McCoy's residence in Hampton. Neither McCoy nor the van was at the address, but the landlord informed the officers that McCoy had loaded his personal belong- ings into the van early that afternoon and was not expected to return. The landlord mentioned that he had seen some items in McCoy's apartment that struck him as unusual possessions for a 3 construction worker, among them an antique clock bearing a Latin inscription and the word "Florida" on its face. Glover suspected that the clock the landlord described and a one-of-a-kind antique Belgian clock (bearing the inscription "Tempus Fugit" and the word "Florida") stolen in a July 24, 1987 burglary of another Hampton Falls residence, were one and the same. Detectives Wardle and Lalley of the Hampton Police Department were present during the discussion of the clock. The landlord permitted the officers to inspect McCoy's apartment; two television sets were found, as well as several pieces of jewelry and a few coins. During the following week, the landlord turned over some of McCoy's mail to Deputy Chief Glover, who noted that two envelopes bore the return address of the First National Bank of Portsmouth. Glover learned that McCoy still had an active account at the Hampton branch of the bank. Bank personnel informed the police that McCoy occasionally brought large quanti- ties of coins to the bank. Glover requested that bank personnel notify either the Hampton Police Department or the Hampton Falls Police Department in the event McCoy made any further contact with the bank. Bank personnel directed Glover to McCoy's employers, Earl and Dean Verity, who owned a construction company and were in the process of building a house very near the scene of another Hampton Falls burglary under investigation by Glover. Glover learned that McCoy had been employed by the company, but had left work suddenly around noon on the day of the Allen burglary, and 4 never returned. The Veritys informed Glover that McCoy had given them some outdoor lawn tools, which Glover noted were similar to the tools stolen in yet another recent Hampton Falls burglary. Within a week after the Allen burglary, Glover learned that McCoy had an extensive criminal record, including convic- tions for breaking and entering, receiving stolen property, and burglary, and that there was a warrant outstanding in another state for his arrest on burglary charges. D. Arrest D. Arrest ______ At 8:55 a.m. on August 21, 1987, McCoy appeared at the drive-up window of the Hampton branch of the First National Bank of Portsmouth. He was recognized by the teller, who requested that he come into the bank to resolve a problem with his account. The Hampton Police Department was notified, and ten police officers were dispatched to the bank.1 The Hampton police arrested McCoy as he emerged from the bank and headed toward the van. Among the Hampton police officers at the scene was Detec- tive Wardle, who had accompanied Glover to the defendant's residence on the evening of the Allen burglary. E. Impoundment and Search of Van E. Impoundment and Search of Van _____________________________ After McCoy was arrested, the van was towed to the ____________________ 1The arrest procedures to be used in the event McCoy ap- peared at the bank had been prearranged by the Hampton Falls Police Department and the Hampton Police Department. As agreed, the Hampton Police Department responded as it would to a bank robbery alarm. 5 Hampton Police Department for an inventory search, but then it was decided to await the issuance of a search warrant.2 Glover filed a search warrant application with the Hampton District Court, supported by the affidavit submitted with the arrest warrant application, four Hampton Falls Police Depart- ment burglary reports, and a photograph of the antique Belgian clock. The warrant issued, but before beginning the search Glover looked in the windows at the contents of the van.3 Glover and a Hampton police sergeant proceeded to search the van. Sixty-one items were inventoried, including the four firearms which form the basis for the federal charges in the present case. On September 26, 1988, McCoy pled guilty in Rockingham County Superior Court to seven felony counts of receiving stolen property. During 1991, he was indicted, tried and convicted on four federal firearms charges under 18 U.S.C. 922(g)(1). We turn to the claims presented on appeal. ____________________ 2Within two hours after McCoy's arrest, Glover was informed by the arresting officers that the license plate number on the van matched the number given to Glover by George Allen, and that it looked as if a paint roller had been used hurriedly to paint the van a maroon color. Black paint was still visible around the door locks and mirrors. The arresting officers further informed Glover that several items, including a clock, power tools, and a number of nylon bags filled with "stuff," were visible through the windows of the van. Detective Wardle advised Glover that he believed that the clock seen in the van was the one described by McCoy's landlord. 3Glover observed a large quantity of tools, a "dozen or so" canvas and nylon tote bags with what appeared to be jewelry spilling out of them, bags of tools, pry bars and hammers, lounge chairs, some clothes, and, most notably, a clock matching the description of the stolen Belgian clock and a leaf blower matching the description of one stolen in another of the Hampton Falls burglaries. 6 II II DISCUSSION DISCUSSION __________ A. Motions to Suppress A. Motions to Suppress ___________________ 1. "Automobile Exception" 1. "Automobile Exception" ____________________ Appellant claims that the evidence seized from the van should have been suppressed because the search warrant obtained by Deputy Chief Glover was not supported by probable cause. Assuming, without deciding, the search warrant was invalid, we nonetheless conclude that the district court properly denied the motions to suppress, as the search was permissible under the "automobile exception" to the Fourth Amendment warrant require- ment. Under the "automobile exception," the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is "probable cause to believe that the [vehicle] contains contraband or other evidence of criminal activity." United States v. Panitz, 907 F.2d 1267, 1271 (1st ______________ ______ Cir. 1990). See Carroll v. United States, 267 U.S. 132, 153-56 ___ _______ _____________ (1925). "The inherent mobility of motor vehicles, [California __________ v.] Carney, 471 U.S. [386,] [] 390 [] [(1985)], and the reduced ______ expectation of privacy associated with them, id. at 391, [] ___ justify application of the vehicular exception '[e]ven in cases where an automobile [is] not immediately mobile.'" Panitz, 907 ______ F.2d at 1271. We have held that probable cause alone justifies a warrantless search of a motor vehicle seized without a warrant 7 while parked in a public place, "whether or not exigent circum- stances prevailed at either the time of the seizure or the time of the search. Moreover, the search, so long as reasonable in scope, need not be conducted contemporaneously with the seizure . . . ." Id. at 1272 (citing cases). Provided there was proba- ___ ble cause to believe that an offense had been committed and that a search would turn up evidence of the offense, see United States ___ _____________ v. Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988), the seizure and _______ search of the van were lawful under the "automobile exception" without regard to the validity of the search warrant.4 At the time of the arrest, Glover knew that McCoy and the van had been observed in highly suspicious circumstances at the scene of the Allen burglary. Glover and Detective Wardle had learned from McCoy's landlord that McCoy possessed a clock similar to one stolen in another nearby burglary, and that he had left hurriedly in the van with his belongings. Over the ensuing week, Glover collected considerable circumstantial evidence from various sources linking McCoy with several other Hampton Falls burglaries.5 Thus, by the time of the arrest there was probable ____________________ 4Provided there was probable cause to search the van at the time of McCoy's arrest, the search was valid even if the arrest was not, as the police would have had an independent basis for searching the van, apart from any exploitation of illegal con- duct. See Brown v. Illinois, 422 U.S. 590, 599 (1975); United ___ _____ ________ ______ States v. Pimental, 645 F.2d 85, 86 (1st Cir. 1981). ______ ________ 5The evidence established that the Hampton and Hampton Falls police conducted a cooperative investigation. Detective Wardle of the Hampton Police Department accompanied Glover to McCoy's residence on the evening of the Allen burglary. Wardle parti- cipated in the discussion with McCoy's landlord regarding the antique Belgian clock seen in McCoy's apartment. The two police 8 cause to believe that burglaries had been committed and that McCoy was in possession of at least some of the stolen property. Glover and Wardle arguably had probable cause to believe that stolen property would be found in the van upon learning from the landlord that McCoy had loaded his possessions in the van on the afternoon of the Allen burglary and appeared to have abandoned his apartment. Assuming that the police had probable cause to believe that a search of the van would turn up evidence of the burglaries, their seizure of the van at the bank parking lot was lawful. Any doubt as to the legality of the search is removed given that prior to commencing the search, some five hours later, see United States v. Moscatiello, 771 F.2d 589, 595, 600 (1st ___ _____________ ___________ Cir. 1985) (eighteen hours between seizure and search); United ______ States v. McHugh, 769 F.2d 860, 865-67 (1st Cir. 1985) (one ______ ______ week), the police looked through the windows of the van and saw an antique clock, closely resembling the stolen Belgian clock, and a leaf blower, closely resembling one stolen in another local burglary. At that point, there can be no question that the police had probable cause to believe the van contained evidence of criminal activity. As the van was lawfully searched, the district court correctly denied the motions to suppress. ____________________ departments communicated "at length" during the week preceding the arrest, and jointly established a procedure for the arrest. Glover learned of McCoy's criminal record, including the burglary and stolen property charges, and communicated a warning to the Hampton police to exercise caution in approaching the defendant. "Where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all." Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1982). ________ _______ 9 10 B. Motions to Dismiss B. Motions to Dismiss __________________ 1. Pre-indictment Delay 1. Pre-indictment Delay ____________________ Appellant claims that the passage of three and one-half years between the seizure of the firearms and the return of the federal indictment violated his Fifth Amendment right to due process and his Sixth Amendment right to speedy trial. a. Due Process a. Due Process ___________ Pre-indictment delay violates due process if "(1) [it] caused substantial prejudice to [the defendant's] right to a fair trial and, (2) the Government intentionally delayed indictment in ___ order to gain a tactical advantage over the accused." United ______ States v. Picciandra, 788 F.2d 39, 42 (1st Cir.) (citing United ______ __________ ______ States v. Marion, 404 U.S. 307 (1971)) (emphasis added), cert. ______ ______ ____ denied, 479 U.S. 847 (1986). See also United States v. Acevedo, ______ ___ ____ _____________ _______ 842 F.2d 502, 504 (1st Cir. 1988). For the defendant to carry the heavy burden of proving actual prejudice from pre-indictment delay, concrete proof is required; mere speculation and bare allegations will not suffice. Acha v. United States, 910 F.2d ____ ______________ 28, 32 (1st Cir. 1990). Although appellant claims that he was prejudiced by the extended pre-indictment delay, in that his decision to plead guilty to the state felony charges was predicated on a "belief" that federal charges would not be filed, he neither alleges nor demonstrates that any agent of the federal government ever represented that he would not be prosecuted for the federal 11 firearms violations. The further argument that the delay diminished the opportunity to serve concurrent time on the state and federal offenses is based on the speculation that either sentence would be made to run concurrently. Moreover, even if the claims of prejudice were sustainable, appellant has not shown that the government intentionally delayed indictment to gain a tactical advantage. See Picciandra, 788 F.2d at 42. ___ __________ b. Sixth Amendment b. Sixth Amendment _______________ Appellant contends that the extended pre-indictment delay violated "the very spirit" of the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. 3161. As appellant concedes, however, no Sixth Amendment right to speedy trial arises prior to the filing of the criminal charge. United States v. MacDonald, _____________ _________ 456 U.S. 1, 7 (1982). See United States v. Marler, 756 F.2d 206, ___ _____________ ______ 211 (1st Cir. 1985) (Sixth Amendment speedy trial right arises at filing of federal indictment).6 ____________________ 6Appellant argues that the district court should have dismissed the indictment for lack of prosecution, pursuant to Federal Rule of Criminal Procedure 48(b), which provides: If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district ____ __ ______ __ ___ ________ court, or if there is unnecessary delay in bringing a _____ defendant to trial, the court may dismiss the indict- ment, information or complaint. Fed. R. Crim. P. 48(b) (emphasis added). Rule 48(b) is limited in application to post-arrest delay. United States v. Marion, _____________ ______ 404 U.S. 307, 319 (1971). Appellant does not complain of unnec- essary delay following the federal indictment. 12 2. Petite Policy 2. Petite Policy _____________ Appellant contends that the federal indictment con- travened the Justice Department's so-called Petite policy, ______ thereby violating his due process rights. The Petite policy, see ______ ___ Petite v. United States, 361 U.S. 529 (1960) (per curiam), is an ______ _____________ internal Justice Department policy forbidding federal prosecution of a person for alleged criminality which was "an ingredient of a previous state prosecution against that person;" exceptions are made only if the prosecution will serve "compelling interests of federal law enforcement." Thompson v. United States, 444 U.S. ________ _____________ 248, 248 (1979). It is a federal prosecutorial policy, not a matter of constitutional law. United States v. Booth, 673 F.2d _____________ _____ 27, 30 (1st Cir.), cert. denied, 456 U.S. 978 (1982). See ____ ______ ___ Rinaldi v. United States, 434 U.S. 22, 29 (1977) (Petite policy _______ _____________ ______ "not constitutionally mandated"). As we have explained, [t]he Petite policy and cases construing it ______ stand only for the proposition that the government's motion to dismiss should be granted when it discovers that it is conduct- ing separate prosecutions for the same of- fense. The doctrine does not create a corre- sponding right in the accused. Booth, 673 F.2d at 30. _____ Appellant argues that Booth is not controlling as the _____ Justice Department revised the policy after Booth was decided. _____ Those courts of appeals which have examined the Petite policy ______ since its revision in 1988, however, have adhered to the view that it does not confer substantive rights on an accused. See, ___ 13 e.g., United States v. Simpkins, 953 F.2d 443, 444-45 (8th Cir.) ____ _____________ ________ (Petite policy does not confer substantive rights on criminal ______ defendant, thus cannot form the basis of claim that subsequent prosecution was improper), cert. denied, ___ U.S. ___, 118 ____ ______ L.Ed.2d 585, 112 S. Ct. 1988 (1992); United States v. Rodriguez, _____________ _________ 948 F.2d 914, 915 (5th Cir. 1991) (as an internal rule of Justice Department, policy may not be invoked by defendant to bar prose- cution), cert. denied, ___ U.S. ___, 119 L.Ed.2d 590, 112 S. Ct. ____ ______ 2970 (1992); United States v. Pungitore, 910 F.2d 1084, 1120 (3d _____________ _________ Cir. 1990) (policy does not confer substantive rights on defen- dants); United States v. Heidecke, 900 F.2d 1155, 1157 n.2 (7th _____________ ________ Cir. 1990) (as internal guideline, policy gives defendant no substantive rights). We hold that neither the Petite policy nor ______ its 1988 revision conferred substantive rights on the defendant. The district court judgment is affirmed. _______________________________________ 14 McCoy McCoy _____ Defendant filed two pretrial motions to suppress the firearms evidence on Fourth Amendment grounds. In one motion, defendant claimed that his arrest was illegal because the arrest warrant was not supported by probable cause as required by the Fourth Amendment. Defendant argued that the firearms discovered in his van were fruits of the illegal arrest and therefore inadmissible against him in a criminal proceeding. In his second motion to suppress, defendant contended that the search warrant for his van was not supported by probable cause, and thus the firearms evidence should be excluded as the fruit of an illegal search. Defendant also filed three pretrial motions to dismiss the indictment. In one motion, defendant argued that pretrial delay before federal charges were filed violated his rights under the due process clause of the Fifth Amendment and the speedy trial clause of the Sixth Amendment. In a second motion, defen- dant argued that unnecessary delay in bringing him to trial warranted dismissal under Rule 48(b) of the Federal Rules of Criminal Procedure. In a third motion, defendant claimed that the government's failure to follow the Petite policy, a Depart- ______ ment of Justice policy against dual or successive federal prose- cutions, violated his rights under the due process clause of the Fifth Amendment. The district court denied both motions to suppress the firearms evidence and all three motions to dismiss the indict- 1 ment. Defendant subsequently was tried and convicted on each of the four counts. Defendant now appeals the denial of each of the five pretrial motions. 2 McCoy McCoy _____ 1. Arrest Warrant 1. Arrest Warrant ______________ Defendant contends that the affidavit supporting the arrest warrant did not establish probable cause. He argues that the description given to police by George Allen was sufficiently broad to encompass a large percentage of the white male popula- tion and therefore insufficient to constitute probable cause that defendant committed the Allen burglary. Defendant contends that information obtained by Deputy Chief Glover after the issuance of the warrant is irrelevant in determining probable cause because the Hampton police effectuated the arrest solely on the basis of the arrest warrant. Defendant argues that information possessed by Officer Glover and the Hampton Falls Police Department may not be imputed to the arresting officers in the Hampton Police Department. United States v. Watson, 423 U.S. 411 (1976), estab- _____________ ______ lished that a warrantless public felony arrest supported by probable cause does not violate the Fourth Amendment. See also ___ ____ Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). If defendant's ________ ____ arrest was supported by probable cause, therefore, the arrest was legal notwithstanding the validity of the arrest warrant. Probable cause exists when "the facts and circumstances within the [police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." United States v. Figueroa, 818 _____________ ________ 1 F.2d 1020, 1023 (1st Cir. 1987) (quoting Beck v. Ohio, 379 U.S. ____ ____ 89, 91 (1983)). "The government need not show 'the quantum of proof necessary to convict'; probability is the touchstone." Id. ___ (quoting United States v. Miller, 489 F.2d 1117, 1128 (1st Cir. _______ _____________ ______ 1978), cert. denied, 440 U.S. 958 (1979)). We must consider the ____ ______ totality of the circumstances in evaluating whether the govern- ment demonstrated a sufficient "[p]robability . . . of criminal activity." Id. at 23-24 (quoting Illinois v. Gates, 462 U.S. 213 ___ _______ ________ _____ (1983)). First, we will examine the facts and circumstances within the collective knowledge of the Hampton Falls and Hampton __________ police departments; then we will determine what portion, if any, of that knowledge may be imputed to the arresting officers. At the time of defendant's arrest, the following was known to Deputy Chief Glover: A man driving a van registered to the defendant and fitting the general description of the defendant was observed at approximately 1:30 p.m. at the scene of the Allen burglary on August 14, 1987. The man appeared nervous, and did not identify himself or offer any explanation for his presence on the property except that he was "just surveying." The man was aware that George Allen recorded his license plate number. The defendant had suddenly disappeared from his construction job around noon on that day, and never returned. The defendant also had been observed "hurriedly" loading his possessions into his van that afternoon, and appeared to have abandoned his place of residence. His landlords had seen a clock in defendant's apartment bearing 2 remarkable similarity to one stolen in an earlier burglary, and had noticed other items in the apartment that seemed inconsistent with defendant's station in life. Defendant had given both his landlords and his employers expensive gifts resembling items stolen in various Hampton Falls burglaries. He was known to bring large quantities of coins, sometimes foreign, to his bank. One of the Hampton Falls burglaries took place across the street from his place of employment and occurred during the relatively brief period of his employment at that location. Finally, he had a criminal history of crimes against property. These facts, in the aggregate, are sufficient to estab- lish probable cause that defendant had engaged in criminal activity. However, we must determine what portion of Deputy Chief Glover's knowledge can be imputed to the arresting offi- cers. That the arresting officer may have lacked probable cause ___ for the arrest of the suspect does not mean that the arrest is invalid for lack of probable cause; it is enough that the collec- tive knowledge and information of all the officers involved establishes probable cause for the arrest. United States v. _____________ Paradis, 802 F.2d 553, 557 (1st Cir. 1986). See also Charles v. _______ ___ ____ _______ Smith, 894 F.2d 718 (5th Cir. 1990), cert. denied, ___ U.S. ___ _____ ____ ______ (19__) (officer lacking personal knowledge of facts establishing probable cause for arrest may nevertheless make arrest if he is merely carrying out directions of officer who does have probable cause); United States v. Rocha, 916 F.2d 219 (5th Cir. 1990), _____________ _____ cert. denied, ___ U.S. ___, (19__) (arresting officer need not ____ ______ 3 have personal knowledge of all facts constituting probable cause, but may rely upon collective knowledge of police when there is communication among them); United States v. Hoyos, 892 F.2d 1387 _____________ _____ (9th Cir. 1989), cert. denied, ___ U.S. ___ (19__) (arresting ____ ______ officer need not have personal knowledge of facts sufficient to constitute probable cause; probable cause may be based on collec- tive knowledge of all officers involved in investigation); Calamia v. City of New York, 879 F.2d 1025 (2d Cir. 1989) (where _______ ________________ law enforcement authorities are cooperating in investigation, knowledge of one is presumed shared by all); United States v. _____________ Rich, 795 F.2d 680 (8th Cir. 1986) (in determining whether ____ probable cause existed for an arrest, court does not merely look to actual knowledge of arresting officer, but to combined knowl- edge of all officers involved). Defendant argues that our decision in Paradis is _______ inapposite because the police departments of Hampton and Hampton Falls were not involved in a contemporaneous investigation. However, the record establishes that Detective Wardle of the Hampton Police Department, one of the arresting officers, accom- panied Deputy Chief Glover to the defendant's residence on the evening of the Allen burglary. That evening, Detective Wardle participated in the discussion with defendant's landlord regard- ing the antique clock seen in defendant's apartment, and learned that defendant had hurriedly loaded his belongings in the van that afternoon and had apparently abandoned his apartment. The record establishes that the two police departments communicated 4 "at length" during the week preceding the arrest, and established a procedure for the arrest. Further, when Deputy Chief Glover learned of the defendant's prior criminal record, he communicated a warning to the Hampton police to use caution when confronting the defendant. We cannot agree with defendant's contention that the Hampton Police Department based their arrest solely on the arrest warrant. On the contrary, ample evidence suggests that the two police departments communicated on numerous occasions about the anticipated arrest during the week between the issuance of the warrant and the arrest. It is appropriate, therefore, to consider the collective knowledge of all the officers involved in determining whether probable cause existed for defendant's arrest. We find the collective knowledge of the Hampton and Hampton Falls police departments at the time of defendant's arrest sufficient to support a finding of probable cause. Defendant's claim that the firearms evidence should have been suppressed as the fruit of an illegal arrest is without merit. 5